## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| LOUIS SPAGNUOLO, an individual,<br><br>     Plaintiff,<br>vs.<br><br>AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY, CHUBB CUSTOM INSURANCE COMPANY, DEPOSITORS INSURANCE COMPANY, GERBER LIFE INSURANCE COMPANY, HARLEYSVILLE INSURANCE COMPANY, HARTFORD CASUALTY INSURANCE COMPANY, MARKEL INSURANCE COMPANY, NATIONWIDE MUTUAL INSURANCE COMPANY, PHILADELPHIA INDEMNITY INSURANCE COMPANY, TRUMBULL INSURANCE COMPANY, ZURICH AMERICAN INSURANCE COMPANY OF ILLINOIS, JOHN DOE(S), an unknown person(s)/corporation(s),<br><br>    Defendants. | CASE NO: 0:24-cv-60422 |

## <u>VERIFIED COMPLAINT</u>

**COMES NOW**, Plaintiff, LOUIS SPAGNUOLO, ("Plaintiff" or "Spagnuolo"), by and through undersigned counsel, and hereby sues Defendants, AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY, CHUBB CUSTOM INSURANCE COMPANY, DEPOSITORS INSURANCE COMPANY, GERBER LIFE INSURANCE COMPANY, HARLEYSVILLE INSURANCE COMPANY, HARTFORD CASUALTY INSURANCE COMPANY, MARKEL INSURANCE COMPANY, NATIONWIDE MUTUAL INSURANCE COMPANY, PHILADELPHIA INDEMNITY INSURANCE COMPANY, TRUMBULL INSURANCE

COMPANY, ZURICH AMERICAN INSURANCE COMPANY OF ILLINOIS, (collectively "Carrier Defendant"), and JOHN DOE(S), an unknown person(s)/corporation(s), and alleges as follows:

<strong><u>INTRODUCTION</u></strong>

1.      Floridians are experiencing an Insurance Crisis never before experienced in the State's history, with insurance premiums skyrocketing in tandem with a freshly minted March 7, 2024, Declaration by Florida's Chief Financial Officer that Florida is also in the thick of a "fraud epidemic".   This is no coincidence as undisclosed fraudulent schemes and agreements between insurance carriers and their appointed broker/agents have become so normalized that illegal profiteering is just another day at the office.   However, these fraudulent kick-back bid-rigging and steering schemes have immediate and serious consequences for the insured and even the independent agents who work for larger brokerages.

2.      Insurance companies like the Carrier Defendants have chosen to abdicate their responsibilities in favor of windfalls of profits, which they bribe their appointed representatives to procure.

3.      From a common understanding, an insurance premium should correlate to the statistical risk of having to pay out a future claim – a fair wager between the insured and insurer, and the insurance brokerage/agency and agent being a special kind of booky who gets paid on the up-and-up and on the down-low in a "heads-I win-tails-you lose" structured casino.

4.      On one hand, the agency or agent is required to be a trusted fiduciary of the insured under the Florida Insurance Code, Fla. Stat. 626 *et. seq.* ("FIC").   However, just having a license from the FDFS is only part one of actually being able to transact insurance business.

5.     The second requirement is that an insurance carrier must appoint a licensee by making a separate certification to the FDFS supposedly based on an independent investigation into the person's moral character, trustworthiness and in compliance with the FIC.   And, once an agency or agent receives an appointment, the carrier also certifies its willingness to be responsible for the acts of its "agency" or "agent" for conduct within the scope of the employment or appointment.

6.     Stirring the pot thicker, is that once an agency or agent has their two credentials, they are required to be the fiduciaries of the insured in negotiating with the insurance carriers for the most appropriate policy and cost-effective premiums, while also keeping in mind that they make a living from commissions reflected as a percentage of the policy premiums.

7.     However, as a brokerage agency or independent agent gets more and more insurance business as to one or more "lines" of insurance coverage, they are offered back-end profit-sharing rewards from insurance companies like the Carrier Defendants. In effect, these relationships between a larger broker/agencies and/or an insurance producer with a large book of business become independent and interdependent racketeering cartels who seek to grab more territory, more power, and more influence by engaging in evermore aggressive and illegal tactics.

8.     These insurance crime enterprises monopolized and strangled competition such that the insured were steered by their agent to purchase policies from "preferred" carriers which were designed to maximize front end/back-end producer commissions and guaranteed renewals for the insurance companies like the Carrier Defendants.

9.     At the end of the day, sadly, the overwhelming majority of the insured will never know how their hard-earned money is being used by their agencies, agents and carriers to create

"more" wealth and influence, and, to the extent they find out, usually, the amount of damages would be insignificant compared with the legal challenge of recovery.

10.     This case is very distinct in that it involves a very large and powerful broker/agency, consisting of over 1,400 agents, more than 70,000 insured customers, over $200 Million in revenues with some 60 locations throughout the United States and is controlled by three family members.[1]  Plaintiff was an agent whom procured a large insurance account, which this family of insurance agents stole through manipulating their agencies' books of account and CRM software. Thereafter, they made undisclosed profits from back-room deals with the Defendant Carriers to receive kick back profits in exchange for their reappointments and guarantees of steering renewals of insurance policy premiums.

11.     Not to be out done, this family also found a third way to use the proceeds from the very large account they stole from Plaintiff to over-valuate the price of their brokerage's private stock Ponzi scheme which has been sold to more than 1,000 of their own dedicated workforces.

12.     Over the last decade, the Defendant Carriers have had plenty of actual and constructive notice that these Appointees were violating the FIC, numerous red flags to follow up on and more than enough reasons to deny their reappointments which are required every 24 months. As alleged herein, the Defendant Carriers cared more about profits and premium renewals, than complying with their obligations under the FIC to protect individuals like Plaintiff, the insured and what hard-working Floridians who have to sacrifice to pay overly inflated insurance rates.

---

[1] On May 9, 2019, Plaintiff filed a separate lawsuit against the Appointees and others alleging they defrauded him over the course of five years from 2013 through 2018.   The Appointees then engaged in a concerted effort to switch jurisdictions and obstruct discovery.   On December 22, 2023, after nearly four and a half years of refusing to turn over documents, Plaintiff finally received financial information which upon careful examination revealed a distinct and intentionally concealed scheme to defraud Plaintiff by the Carrier Defendants and the Appointees which has spanned for over a decade.  The claims herein relate to separate damages, harms and requested relief.

13.    Herein, Plaintiff seeks claims for violations of the **Federal Civil Racketeering Statute**, 18 U.S.C. 1962(c) and 1964; and, *inter alia,* **Florida's Civil RICO Act**, **Fla. Stat. § 772.103(3) and 772.104**, and common law negligence.

14.    Plaintiff herein seeks damages, treble damages, in excess of $30,000,000.  Plaintiff also seeks immediate and consequential statutory equitable relief under **Florida's Criminal RICO Act "Civil Remedies", Fla. Stat. §§895.05(1) and (6)**, including, *inter alia*: (1) placing restrictions upon current profits realized by the Carrier Defendants related to expired policies from the TLE Account; [2]; (2) immediately divesting the Carrier Defendants' interests in and dissolution of the Quid Pro Quo ***Enterprise Association in Fact; and*** (3) ordering the *immediate* suspension of the Carrier Defendants Certificate of Authority to transact insurance. [3]

## JURISDICTION AND VENUE

15.  Court has jurisdiction over the subject matter of the causes of action in this Complaint by virtue of:

a)  Federal question jurisdiction pursuant to 28 U.S.C. § 1331, involving an action pursuant to 18 U.S.C. §§ 1964(a) and (c), the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO");

b)  Diversity of citizenship pursuant to 28 U.S.C. § 1332 and Plaintiff alleges damages in excess of $30,000,000.00;

c)  Supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), involving claims that are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States

---

[2] **Fla. Stat. 895.05(1)(b) and (6)** (the creation of constructive trust as to future revenues only); and/or *e.g.* via prejudgment writ of attachment **Fla. Stat. § 76.05**, pre-judgment writ of garnishment **Fla. Stat. § 77.03**.
[3] **Fla. Stat. 895.05(1)(d)**; *See as guidance e.g.* **Fla. Stat. §§626.211, 626.611(g)(i)(j)(k) and (m); §626.6115(1)** (Criteria for granting and revoking individual and agency insurance licenses).

Constitution.

16. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants transact business in this district or, alternatively, this district is where a substantial part of the events or omissions giving rise to the claim occurred.

17. Venue is also proper in this district pursuant to 18 U.S.C. § 1965. More specifically, each Defendant Carrier is an Authorized Insurer as defined by Fla. Stat. §§ 624.03 and 624.09 and at all times material hereto, maintains a Certificate of Authority ("COA"), directly or indirectly, to transact insurance in Florida issued by the Florida Department of Financial Services ("FDFS"). This COA grants each Carrier Defendant authority to effectuate the appointment of an individual or entity that has previously been granted an insurance license having complied and satisfied the requirements provided within Fla. Stat. § 626.211.  Pursuant to Fla. Stat. § 626.451(2), each Defendant Carrier had or has appointed certain material individuals and entities alleged herein to be their agents [whom are described further as Associates-in-Fact of the "Quid-Pro-Quo RICO Enterprise] ("Appointees").   Pursuant to Fla. Stat. §626.451complianceDefendant Carriers, having made separate independent investigations of the Appointees, certified each to be of good moral character, trustworthiness and compliant with the FDFS, and also certified their respective willingness to be responsible for the acts of their appointee agents within the scope of employment or appointment.  Material hereto, each Appointee, and thus, each Defendant Carrier via Fla. Stat. § 626.451(3), engaged in conduct proscribed by 18 U.S.C. § 1962(c), Fla. Stat. § 772.103(3) and Fla. Stat. § 895.03(3) which was directed to this district via U.S. Mail or interstate wires to Plaintiff for which relief is sought pursuant to 18 U.S.C. § 1964(c).

18. Venue is also proper in this district pursuant to 18 U.S.C. § 1965 as each Defendant Carrier was/is associated with and directly and/or indirectly participated in conduct proscribed by

18 U.S.C. § 1962(c), with the Appointees and/or others which caused damage to Plaintiff in this district for which relief is sought pursuant to 18 U.S.C. § 1964(c).

## PARTIES

19.     Plaintiff is a Florida resident residing in Broward County, Florida.

20.     Defendant AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA is a company incorporated and existing under the laws of Pennsylvania.[4]

21.     Defendant, BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY, is a company incorporated and existing under the laws of Nebraska.[5]

22.     Defendant CHUBB CUSTOM INSURANCE COMPANY is a Company incorporated and existing under the laws of Delaware.[6]

23.     Defendant DEPOSITORS INSURANCE COMPANY is a Company incorporated and existing under the laws of Iowa.[7]

24.     Defendant GERBER LIFE INSURANCE COMPANY is a Company incorporated and existing under the laws of Michigan.[8]

25.     Defendant HARLEYSVILLE INSURANCE COMPANY is a Company incorporated and existing under the laws of Ohio.[9]

---

[4] This Defendant is also subject to personal jurisdiction pursuant to Fla. Stat. § 48.193 in that Defendant engages in substantial and not isolated activities within the State of Florida, has sufficient contacts within this jurisdiction upon which to support personal jurisdiction, and because subjecting it to personal jurisdiction in the Southern District of Florida does not otherwise offend traditional notions of fair play and substantial justice. Specifically, Defendant engaged in and/or carried on business and business ventures in the State of Florida and throughout the United States relative to the offering of insurance policies and collection of policy premiums on various lines of insurance, of which the IOA Parties were or are brokers/agents of record and this action arises out of those activities. Additionally, Defendant has caused Plaintiff to suffer injury in this State as a consequence of the acts alleged herein. Further, Defendant is subject to jurisdiction pursuant to 18 U.S.C. § 1965.
[5] Id.
[6] Id.
[7] Id.
[8] Id.
[9] Id.

26.     Defendant HARTFORD CASUALTY INSURANCE COMPANY is a Company incorporated and existing under the laws of Connecticut.[10]

27.     Defendant MARKEL INSURANCE COMPANY is a Company incorporated and existing under the laws of Illinois.[11]

28.     Defendant NATIONWIDE MUTUAL INSURANCE COMPANY is a Company incorporated and existing under the laws of Ohio.[12]

29.     Defendant PHILADELPHIA INDEMNITY INSURANCE COMPANY is a Company incorporated and existing under the laws of Pennsylvania.[13]

30.     Defendant TRUMBULL INSURANCE COMPANY is a Company incorporated and existing under the laws of Connecticut.[14]

31.     Defendant ZURICH AMERICAN INSURANCE COMPANY OF ILLINOIS is a Company incorporated and existing under the laws of Illinois.[15]

## RESERVATION TO NAME ADDITIONAL DEFENDANTS

32.     In addition to the entities set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiff but respecting whom Plaintiff currently lacks specific facts to permit Plaintiff to name such person or persons as a party-defendant(s).

---

[10] This Defendant is also subject to personal jurisdiction pursuant to Fla. Stat. § 48.193 in that Defendant engages in substantial and not isolated activities within the State of Florida, has sufficient contacts within this jurisdiction upon which to support personal jurisdiction, and because subjecting it to personal jurisdiction in the Southern District of Florida does not otherwise offend traditional notions of fair play and substantial justice. Specifically, Defendant engaged in and/or carried on business and business ventures in the State of Florida and throughout the United States relative to the offering of insurance policies and collection of policy premiums on various lines of insurance, of which the IOA Parties were or are brokers/agents of record and this action arises out of those activities. Additionally, Defendant has caused Plaintiff to suffer injury in this State as a consequence of the acts alleged herein. Further, Defendant is subject to jurisdiction pursuant to 18 U.S.C. § 1965.
[11] Id.
[12] Id.
[13] Id.
[14] Id.
[15] Id.

By not naming such persons or entities at this time, Plaintiff is not waiving his right to amend this pleading to add such parties, should the facts warrant adding such parties.

## **GENERAL ALLEGATIONS**

**The Defendant Carriers' Transaction of Insurance Business in Florida**

33.    Under Florida law, the Carrier Defendants must apply for and obtain a Certificate of Authority to transact business in the State of Florida.

34.    Once obtained, the Carrier Defendants are required to operate under its Certificate of Authority by itself and its agents complying with the FIC.

35.    Each and every insurance brokerage/agency or insurance agent must, in similar fashion, first obtain a license from the FDFS, which includes the submission to a background investigation, passing one or several examinations and establishing to the FDFS to be of good moral character and trustworthiness in order to be licensed. This is part one of being authorized to transact insurance under the FIC.

36.    Separately, each insurance brokerage/agency or insurance agent must also receive an appointment from an insurance carrier that has a valid Certificate of Authority.

37.    Upon application by a licensed insurance brokerage/agency or insurance agent, each individual Carrier Defendant operating under its Certificate of Authority is required to engage a comprehensive and independent investigation into each appointee applicant as to their initial appointment, which similarly includes an inquiry into the character, trustworthiness and that otherwise the appointee applicant is in compliance with the provisions of the FIC.

38.    After this investigation and inquiry, the FIC requires each of the Defendant Carriers to certify they have completed an independent investigation and also certify that, in the carrier's opinion, they are appointing the brokerage/agency and insurance agent to act as their agent, being

satisfied that they are of good moral character and are in compliance with the provisions of the FIC.

39.     In this case, each of the Defendant Carriers appointed that certain large insurance brokerage/agency located in Longwood, Florida, and/or appointed one or all of the three family members who founded or have directed it since 1988 (collectively with the private agency "Appointees").

40.     Each and every Defendant Carrier not only issued the Appointees' initial appointment, but have since, each in turn, reappointed one or all of the Appointees in not less than three instances of electronic transmissions over interstate wires to the FDFS.

41.     Each and every Defendant Carrier's certification as to one or all of the Appointees was a fraud upon the State of Florida, and caused damage to the Plaintiff and others, because each Defendant Carrier failed to comply with their statutorily defined obligations relative to investigating and formulating their certified opinions as to the Appointees fitness, trustworthiness, and compliance with the FIC.   More specifically, each and every Defendant Carrier failed to, *inter alia*:

> (1) formulate any meaningful investigative process which did anything but a routine background check that never followed up with information which would tend to impugn the Appointees character;
> (2) implement universal standards for making certifications of fitness which would deny appointment or reappointment regardless of the amount of business the application had or currently sends to the Defendant Carrier; to the State of Florida;
> (3) establish clear and unequivocal guidance and training to compliance employees or investigators such that readily available public information could be researched and evaluated prior to issuing a certification of the Appointees or any appointees;
> (4) engage processes for contacting character witnesses, or witnesses which related to information considered concerning to the compliance employees or internal investigators;

(5) promulgate proscribed procedures for alerting management of information which would qualify for additional investigations or inquiries into any appointee applicant or the Appointees specifically;

(6) failed to investigate within each of the Defendant Carriers internal systems to determine if any of their officers, directors, employees, departments, or other agents had entered into back-end contingency agreements or horizontal non-competitive agreements with other carriers related to the Appointees or any other appointee applicant;

(7) engaged a "run" report as to the amount of business being referred to and bound with each Defendant Carrier as to each of the Appointees or other appointee applicants for purposes of making further inquiries based upon the known correlation between large brokerages binding numerous policies on the same lines of insurance and illegal kick-back agreements;

(8) proscribe and implement a clearly noticed policy of non-retaliation for an internal reporting of information which could disqualify any of the Appointees or others like them which drove large amounts of business to the Defendant Carrier;

(9) creating and implementing standard policies which foster compliance with the FIC by each Defendant Carrier and the agents, the Appointees; and

(10) engage in, or create, or design an ongoing investigatory practice which would seek to research or obtain through private submissions information which could disqualify the Appointees or those like them, such that each Defendant Carrier would also be operating in accordance with the FIC and their individual Certificate of Authority.

42.    Defendant Carriers were required to reappoint the Appointees every twenty-four (24) months and recertify Appointees as fully compliant with the FIC and otherwise fit and trustworthy to transact insurance in Florida. However, with regard to re-appointing the Appointees, the Defendant Carriers failed to engage policies, procedures and standards referenced herein above.

43.    Each and every Defendant Carrier reappointed the Appointees because of their strategic partnership in the Quid-Pro-Quo Enterprise in that the Appointees were steering hundreds of thousands if not millions of dollars in policy premiums to the Defendant Carriers.  Regardless

of the sufficiency of their investigations, or the veracity of their certifications, the Defendant Carriers, but transmitted the Appointees appointments over interstate wires to the FDFS, they also certified their willingness to be responsible for the Appointees' conduct under Florida Stat. 626.451(3).

### Plaintiff Spagnuolo and the TLE Account

44.     In this case, in late 2012, Spagnuolo, a very successful entrepreneur and licensed insurance agent with substantial connections to high-net worth individuals, celebrities, sports legends, actors, National Football League and National Basketball Teams' front offices, exotic car franchises and other national franchisors, was recruited by the co-founder and figure head of Insurance Office of America, Inc. ("IOA"), Appointee, John Ritenour ("John").

45.     Appointee John identified Spagnuolo's inexperience in the world of insurance and saw an opportunity to connect the Appointees to Spagnuolo's vast network in several vertical industries, including the private jet, real estate markets and to other insurance brokerages who were looking to sell their shops.

46.     John preyed upon Spagnuolo and joined himself to Plaintiff's hip hoping to become part of a world which he had never known or experienced. Indeed, Spagnuolo's business connections, along with his business acumen, were akin to recruiting the star athlete who could attract more people to the stadium and possibly take IOA from the 20th largest independent brokerage/agency to the top 5.

47.     John saw that Spagnuolo was being recruited by other agencies and he personally headed his recruitment by private invitations to his country club, tours of his golf course and dinners with he and his wife where they imparted upon him that IOA was a family, where everyone watches each other's back to collectively become successful.

48.     In early March 2013, Spagnuolo agreed to become an IOA Agent, John assisted him in applying for additional insurance licenses and fast tracked his appointments which hung at IOA until 2023.

49.     In 2013, Spagnuolo acting as an agent for IOA and procured a very large account for the largest pre-school franchise in the United States, The Learning Experience (the "TLE Account').

50.     In November 2013, TLE made the decision to hire IOA as its agency.

51.     In that same month, the Appointees manipulated IOA's books and records such that John Ritenour was designated Lead Agent on the TLE Account and Spagnuolo was not recorded as an agent of record as it related to IOA and the TLE Account.

52.     Over the next five years, from 2014 through February 2019, the Appointees acted and/or directed that Spagnuolo receive via U.S. Mail 20 fraudulent hand-written purported reconciliations which failed to provide him anything close to full disclosure of the financial status of the TLE Account.

53.     In each of these approximately 20 mailings, was also a live check drawn upon the account of an unlicensed limited liability company belonging to John Ritenour.

54.     During this same time period, the Appointees engaged measures, acting in their official capacities, to remove Spagnuolo from receiving emails related to the TLE Account and sending him false information via email about the TLE Account.

55.     From 2013 through February 2019, and through present day, each Defendant Carrier was required to independently investigate IOA, John, Heath and Valli with respect to their appointments, however, they failed to employ such reasonable measures which were directed at determining whether they were in compliance with Florida Chapter 626.

56.     In January of 2019, Appointee John Ritenour retired from IOA and was in the process of selling his IOA stock and, upon information and belief, 1188 Partners to IOA.

57.     While the valuation of 1188 Partners was being negotiated with IOA with an approximate purchase price of over $5 million being discussed after deducting amounts paid to Spagnuolo from 1188 Partners from the valuation, and before John Ritenour announced his retirement to Spagnuolo, his son and, at that time, CEO of IOA, Heath Ritenour, e-mailed his mother, Valli Ritenour, stating in relevant part: "I assume I am going to need to keep paying Louis [on the TLE Account] annually, right?"

58.     Valli Ritenour responded to him: "I think so, I copied your Dad on it."

59.     A few minutes later, however, John Ritenour wrote to Valli Ritenour and Heath Ritenour stating: "I am not going to continue paying him."

60.      Valli Ritenour e-mailed John Ritenour and Heath Ritenour: "Ok. Well I sent him a commission in January because it was the December commissions.  Anyway, you better tell him."

61.     Thereafter, on January 16, 2019, Appointee John Ritenour e-mailed Spagnuolo, stating, "Louis, I wanted to let you know that I have retired on 1/1/2019 and our deal on the TLC (sic) has come to an end."

62.     Spagnuolo responded by asking John Ritenour if IOA still had the TLE account.

Appointee John Ritenour then responded by e-mail, stating, "Louis, as you know the commission that was paid to you came from me.  I will no longer be receiving commissions so there is no way that I can continue this."

63.     While Spagnuolo remained a licensed agent with his appointments "hung" with IOA until 2023 and was entitled to receive 60% of the new and renewal business emanating from

the TLE Account, he received zero, while the Appointees repeated windfalls in direct producer commissions and the Defendant Carriers made millions.

64.     In 2023, the TLE Account represented nearly 1% of IOA's total revenue, provided Appointees, on paper, nearly $250,000 in producer commissions, with $1,500,000 to IOA as agency commissions, and, upon information and belief, over $250,000 in undisclosed commissions to the Appointees.

65.     In 2023, the TLE Account reaped nearly $10,000,000 in premiums to the Carrier Defendants, and likely over $30,000,000 since 2014.

**The Appointees Quid-Pro-Quo Schemes**

66.     The Appointees and the Carrier schemes were based, in part, on "contingent commission agreements" they had entered into with the Defendant Carriers as it relates to Plaintiff, but also other similar agreements with other Carriers relative to other lines of insurance.

67.     The agreements with the Defendant Carriers were called "placement service agreements," "override agreements," "market service agreements," and "compensation for service to underwriter agreements," among other descriptive names (collectively "Fraudulent Agreements").

68.     All of these Fraudulent Agreements were designed to accomplish the same objectives, the payment of additional undisclosed commissions to the Appointees. These fraudulent and undisclosed commissions were periodically calculated at a post-sale time on an entire portfolio of insular (lines of insurance) insurance business that the Appointees, or others at their direction who were business associates of IOA, placed with the specific Defendant Carrier during that time period.

69.     Under these Fraudulent Agreements, one or more of the Appointees, was paid undisclosed, or inadequately disclosed, compensation by insurers that was in addition to the agreed-upon fees or commissions it received from policyholders.

70.     The amount of contingent commissions that each participating Defendant Carrier paid to one or more of the Appointees, directly or indirectly, upon the premiums received from the TLE Account,  was based on one or more of the following factors: (1) the aggregate dollar value of business that the Appointees placed with the Defendant Carrier; (2) the renewal rate of TLE policies which grew substantially from 2014 through 2023 as more TLE corporate and franchisee locations were opened (notably here is that Appointee Heath Ritenour has touted IOA as having a 93% renewal rate, and an average 7 year account holding); (3) the renewal rates of other clients of the Appointees; and (4) the profitability of the business placed with the Defendant Carrier by the Appointees, which, upon information and belief, was quite substantial as to TLE policies.

71.     Payments to the Appointees, directly or indirectly, on the Fraudulent Agreements was always underscored by the Appointees continued manipulation of IOA's books of accounts which initially designated Appointee John as Lead Producer, instead of Spagnuolo and now includes Appointee Heath as a producer.

72.     This foundation of fraud allowed for Appointees to use hundreds if not thousands of TLE policies to achieve these willingly provided Fraudulent Agreements scoring them, upon information and belief, another approximate 5% to 20% percent of the policy premiums.

73.     At the same time, each Defendant Carrier would in turn reap enormous profits without any or any meaningful competition. Upon information and belief, in 2023 alone, the Appointees received over $150,000 in undisclosed kickbacks, while the Defendant Carriers cleared nearly $10,000,000 in total profits.

74.     On the one hand, none of which was possible but for the Defendant Carriers continued reappointing of the Appointees every 24 months by making certifications to the FDFS as to the Appointees good moral character, trustworthiness, and compliance with the FIC.

75.     On the other, none of this was possible but for the Appointees' conduct within the scope of their employment and appointment, which included designating who owned the TLE Account and who received producer commissions on the TLE account through making false entries upon the books of IOA – for which each Defendant Carrier agreed to be responsible for in each reappointment certification.

76.     These Fraudulent Agreements and transactions were hidden from TLE, as well as, Spagnuolo, and whomever received a commission payment from IOA directly, but was duped for five years (2014-2019) by Appointees sending him hand-written fraudulent commission reconciliations of the purported TLE Account and issuing him live checks from a bank account attached to an unlicensed LLC owned by Appointee John where some of the TLE monies were commingled with other deposits such to make legitimate and illegal monies made by Appointees untraceable.

**<u>Bid Steering Schemes</u>**

77.     In order to maximize the amount of contingent commissions and other forms of undisclosed compensation it received, the Appointees illegally steered TLE policies and those of other clients to the Defendant Carriers, engaged in such practices as sending false bids to TLE's franchisees or corporate locations, such to protect the Defendant Carriers from real competition, and helped insurers either raise premiums or initially quote higher premiums which were then presented to other TLE franchisees as the deal of the century premium amounts offer to all other TLE corporate and franchisee locations.

78.     At some point in 2015, the Appointees centralized the management and placement of certain and specific lines of insurance and the responsibility for related Fraudulent Agreements to an individual who conceived, created and/or launched a new propriety system which purportedly assessed a score to a business or person which could be manipulated internally by IOA.  This score, Appointees claim, correlates like a credit score in that a better score translates to a better interest rate or a lower premium.

79.     This scheme allowed the Appointees to not only centralize the placement of lines of insurance but provided an arbitrary rationale for an increase of an insurance quote, along with a few things the insured could do, like take a training class, which would magically improve the risk score such that the premium quote would fall.  Thereafter, IOA's centralized steering team would work to bind insurance with the Defendant Carrier at a higher premium but it would seem like an excellent price compared to the quote received before the self-actuating improvement of the risk score.

**Appointees John and Heath Acknowledge Business as Usual**

80.     In statements made to Spagnuolo, Appointee John would spin the utilization of the Fraudulent Agreements as being a racket but a racket with blurred lines where legality was based upon the normalization of the practice – as he said, "business as usual", several times in punch-line quips.

81.     Appointee John similarly stated to other IOA agents that these Agreements were the means of making real money in the industry.

82.     In his conversations with Spagnuolo, Appointee John acknowledged that the insured had no clue and implied they would be too "stupid" to ever find out, ending with, even if

they did, it didn't matter because these kickbacks come in many instances after the policy contract is over and the Defendant Carrier is just sending out quasi-bonuses.

83.    For his part, Appointee Heath became CEO of IOA in 2008, without any prior executive experience and having only been in the insurance industry for a short period of time considering he was taking the helm of a company which then boasted revenues of nearly $100 Million Dollars, with 40 locations and about 1000 agents. After becoming CEO, Heath's reputation for ruthlessness and procuring his station through solidifying back-end kickback agreements included modifying the standard commission structure of IOA from 60% to much more diversified percentages.

84.    Additionally, from accounts of many individuals associated with IOA, Heath's insecurities resulted in overcompensating decision making which rocked the morale at many local IOA branches.   Seeing this, and with his own plans of a huge liquidity event upon retirement, IOA initiated new schemes which would fund the acquisition of other broker/agents, all directed to leverage the Appointees influence in attracting more lucrative back-end commissions which would be paid to Appointees John and Heath even though other IOA agents were the lead producers on the various accounts.

85.    From 2008 through 2018, IOA implemented a private stock purchase plan which was admittedly patterned as a Ponzi-scheme which capitalized the acquisition of other brokerages.

86.    At some point, Appointees made the board of directors permanent, thereby ending any dissenting voices and solidifying Appointee's Heath's role as leader of IOA notwithstanding the drop in morale and confidence in the organization.

87.     Then around 2010, the Appointees engaged policies to artificially make IOA appear more profitable, which increase fresh capitalization and resulted in purchasing power to acquire other brokerages.

88.     In 2011, the Appointees began aggressively recruiting new producer agents with large books of business or business potential.

89.     From 2014 through 2019, with the help of the TLE account and increasing capital injections from the sale of private stock, IOA "grew", but in reality, the real increase of moneys was to the Appointees as the recipients of the fruits of these back-end deals.

90.     In 2019, Appointee John allegedly retired and sold his stock which had increased in value over 400% since 2012 and remained as an IOA producer who collected commissions on the TLE account along with Appointee Heath.

91.     By 2019, the TLE account had grown substantially, and over the last five years, while continuing to defraud Spagnuolo, they have steered TLE's new and renewal policies to the Carrier Defendants that happily pay Appointees untold windfalls of back-end undisclosed commissions which, in reality, never belonged to them in the first place.

**The Carrier Defendants' Profits from the TLE Account are Ill-Gotten Gains**

92.     Under these Fraudulent Agreements, the Appointees were paid undisclosed, or inadequately disclosed, compensation by each separate Defendant Carrier in a similar manner, which was in addition to the agreed-upon fees or commissions the Appointees received from policy holders.

93.     Moreover, since Appointees had manipulated IOA's CRM system to cut Spagnuolo out of any direct commissions, the Appointees were receiving additional undisclosed commissions on top of those agreed upon commissions.

94.     At the same time, the Appointees illegally steered TLE Policies to the Defendant Carriers who knew that they were paying the Appointees illegal commissions to acquire the business, and also knew that they failed to undertake any meaningful investigation of the Appointees before certifying them to the FDFS.

95.     From 2014 through present, each of the Defendant Carriers sent at least two false, fraudulent and/or intentionally incomplete documents over interstate wires to the FDFS certifying the Appointees were in compliance with the FIC when the same was untrue.   By so doing, the Defendant Carriers knew, should have known and/or were strictly liable for the Appointees' actions, which included accepting a million dollars or more in undisclosed back-end payments.

96.     All profits earned from these schemes to steer TLE premiums to the Defendant Carriers were derived from their association with the Appointees where clear quid-pro-quos resulted in a Quid-Pro-Quo overarching scheme which defrauded Plaintiff and others.

97.     In 2023, the Defendant Carriers, and potentially other carriers, collected more than $10,000,000 in policy premiums derived from the TLE Account and the Quid-Pro-Quo Scheme.

98.     From 2013 through present, upon information and belief, the TLE Account has driven over $30,000,000 in revenues to the Defendant Carriers who have, acted in concert, through horizontal associations, to drive out competition from other insurance companies.

99.     Importantly, the TLE Account has remained with the Appointees since 2013, and since 2015.  Presently, the Appointees boasts of a 93% account retention rate with an average of 7 years servicing any account, and, upon information and belief, the TLE Account grows approximately 15% per year due to additional franchisees signing up with IOA.

**Defendant Carriers Turn a Blind Eye to Countless Red Flags and Reappoint Appointees who Pillage and Damage Countless others in violation of FIC**

100.    Had the Defendant Carriers actually engaged their statutory duties to investigate the Appointees, they would have easily and readily discovered that Spagnuolo is not alone in his experience of being a person, agent, employee, or business associate defrauded by IOA and many publicly available records were readily accessible to the Defendant Carriers.

101.    For instance, in the matter entitled *Julie Schumer v. IOA,* 18th Judicial Circuit, Seminole County, Florida: Case Number: 2015-CA-001031-15-L, Julie Shumer was a producer for an IOA acquisition target called Professional Medical Insurance Services, Inc. At the time of the acquisition, Julie Shumer was owed over $700,000 in deferred commissions. John Ritenour and Tatum personally promised IOA would pay Julie Shumer the deferred commissions.

102.    In *IOA Group, LLC v. Mary Lawless,* 18th Judicial Circuit, Case Number: 2015-CA-000388-15-K, while working for IOA, Lawless countersued IOA Group because she helped secure a contract with AAU. Heath Ritenour and Lawless reached a verbal agreement regarding the split of commission on the AAU account. [The] verbal agreement was set up within IOA's Agency Management System EPIC, to account for the transaction. Lawless sued because IOA stopped paying her monthly commission on the AAU account.

103.    Additionally, in the matter entitled *Dennis Doyle v. IOA*, Duval County Case No: 16-CA-1638, Doyle was not paid his insurance commissions on an "oral agreement" with John K. Ritenour and Tony Tatum. Instead, Doyle received a check from "Johnsons Insurance Agency" as payment for commission and assurance that the remainder would be forthcoming.

104.    That said, agents, employees, account managers and business associates of IOA, John, Heath, Valli and 1188 Partners are not the only parties injured through the scheme to draw

upon various wells to drive artificial and fraudulent reviews into IOA.  Many are the clients and customers themselves, some of whom have filed lawsuits.

105.    Rather, drawing revenues through fraudulent practices relative to IOA's agents/employees or their customers is a regular pattern and practice for IOA, its executives, and its affiliated entities.

106.    For instance, IOA and its "Vice-President and Co-owner", Mark Manfre allegedly devised a scheme to bill large corporations for "marketing fees" and "agency fees". *See the matter styled: In the United States District Court for the Northern District of Illinois, Eastern District, Executive Affiliates, Inc., et al, v. Insurance Office of America, Inc., et al., Case No: 18-cv-4343.* In this case, defendants allegedly billed additional charges over their insurance premiums disguising the charges as "marketing expenses" and "insurance marketing expenses" over and above their commercial insurance premiums, workers compensation premiums, employment practices premiums and other policies brokered by IOA.

107.    The alleged over-charged expenses amounted to the defendants pocketing over $2.8 million dollars over the insurance premiums, a small drop in the bucket for the nearly billion-dollar IOA Enterprise.

108.     Manfre, at the direction of John over-billed and overcharged IOA customers, all in violation of the FIC which the Defendant Carriers ignored.

109.    By way of another example, in 2017 Scott Strenger, a former IOA agent, sued IOA and companies affiliated with IOA, including IOA Northeast NY, Inc., raising very similar allegations.

110.     Upon information and belief, in approximately 2013, Strenger was offered employment with IOA Northeast NY, Inc., a company affiliated with IOA, after meeting with John Ritenour and Valli Ritenour in Florida, among other things.

111.     Upon information and belief, Strenger accepted that offer of employment in reliance upon the various promises made to him regarding his compensation and other matters.

112.     Upon information and belief, although Strenger had been promised forty percent of commissions and renewals, he quickly realized that IOA was not living up to that promise.

113.     Upon information and belief, Jeffrey Miner, the executive vice president and managing partner of IOA Northeast NY, Inc. and also a shareholder in IOA and its affiliated companies, took over one of Strenger's largest account, Skyline Windows, for the purpose of depriving Strenger of half of his commission on that account.  He did so without authorization from or notice to Strenger.

114.     Upon information and belief, in furtherance of the fraudulent scheme, Strenger was not invited to relevant meetings regarding the account and was removed from the e-mails associated with the account and the corresponding referrals.

115.     Upon information and belief, Strenger was also deprived of the referrals on that account, which were improperly taken over by John Ritenour.

116.     Upon information and belief, when Strenger inquired about why he was not getting commission on the referrals, he was told that John Ritenour met with the head of Skyline Window's consulting firm and, thus, any further referrals associated with Skyline Windows would be credited to him.

117. Upon information and belief, when Strenger also complained about Miner taking half of his commissions, he was consistently assured that the "financial discrepancies" were being addressed and he would be compensated.

118. Further, and upon information and belief, with the exception of one occasion on which he received an illegible commission report, Strenger never received a commission report from IOA or its affiliated entities. And, upon information and belief, his requests to speak to someone in the corporate office about the issues at the New Jersey office were refused.

119. Upon information and belief, Strenger never received the commissions owed to him by IOA and its affiliated entities.

120. Likewise, Rick Collins has also alleged similar treatment by IOA and its affiliated companies when he sued them on May 3, 2018.

121. Upon information and belief, Collins was enticed with promises of better compensation by IOA Northeast NY, Inc. in 2013.

122. Upon information and belief, although Collins was promised forty percent of commission on his accounts, among other things, Miner, as he did with Strenger, took half of the commissions on at least one of his accounts, H&M Intermodal, without any authorization or notice to Collins.

123. Upon information and belief, Collins was provided monthly commission/production reports showing that he was allegedly receiving the full forty percent commission he had been promised, but he subsequently discovered that those reports were false and that he was only receiving twenty percent.

124. Upon information and belief, Collins never received the commissions owed to him by IOA and its affiliated entities. Pursuant to Florida law, in order for an insurance producer such

as John, Heath, and Valli, to sell or procure insurance if the individual obtains an insurance license *and* is appointed by an insurance carrier.

## Fla. Stat. 626.451 - APPOINTMENT OF AGENT OR OTHER REPRESENTATIVE

125.     The Department of Financial Services ("DFS") issues an insurance license upon its own character and fitness review upon statutorily defined application procedures and criteria. However, an appointment by an insurer is different from a license.

126.     Under Florida Statute, the decision to grant an original appointment or renew an existing appointment rest with an appointing entity (insurer).

127.     An "appointment" is the authority conferred by an insurer to a licensee to transact insurance on the insurer's behalf. Pursuant to Fla. Stat. 626.451(2), when making an appointment, an insurer is also claiming that it has looked into the appointee's character and reputation and believes the person is fit to engage in the insurance business.

128.     Section 626.451(2) of the Florida's insurance laws states,

> By authorizing the effectuation of an appointment for a licensee, the appointing entity is **thereby certifying to the department that an investigation of the licensee has been made and that in the appointing entity's opinion and to the best of its knowledge and belief, the licensee is of good moral character and reputation, and is fit to engage in the insurance business**.

129.     Pursuant to Fla. Stat. 626.451(3), by appointing Defendants, Heath, John, IOA, Valli and 1188 Partners, the Defendant Insurers are also assuming strict liability for these Defendants' conduct and that they are "willing to be bound by the acts" of these Defendants…within the scope of the licensee's employment or appointment. Subsection (3) states:

> By authorizing the effectuation of the appointment of an agent, adjuster, service representative, customer representative, or managing general agent the appointing entity is thereby certifying to the department that it is willing to be bound by the acts of the agent, adjuster, service representative, customer representative, or

managing general agent, within the scope of the licensee's employment or appointment.

130.    As licensed and appointed agents, IOA, John, Heath, 1188 Partners, and Valli were fiduciaries of the public trust, and the wrongful acts as more fully described herein, were conducted within the scope of their employment and/or appointment.

131.    Moreover,  IOA, John, Heath, 1188 Partners, IOA and Valli's insurance activities, transacting insurance and business practices were statutorily required to be within the laws and regulations of Florida, which prohibited them from engaging in prohibited practices, such as illegal dealings and stealing insurance commission proceeds from Spagnuolo and others, either by stealing part of or an entire account, or through taking the Risk Score 5% or by using the ill-gotten gains to artificially inflate the value of a private security for personal gain.

132.    Defendant Insurers knew, or had reason to know, that Defendants Heath, John, Valli, IOA and 1188 Partner's had engaged in, or continued to engage in conduct which is subject to compulsory or discretionary license revocation, or otherwise demonstrated unfitness to transact insurance and Defendant Insurers had an independent duty to investigate on an ongoing basis the good moral character, reputation, and fitness to engage in the insurance business.

133.    Defendant Insurers failed to engage, undertake and/or perform a reasonably thorough investigation, and/or undertake their statutory obligations to investigate and/or reasonably inquire, after being on actual and/or constructive and/or inquiry notice into whether IOA, John, Heath, Valli and 1188 Partners had been engaged in, aided and abetted and/or willfully or recklessly violated applicable provisions of Florida Chapter 626 and Florida Administrative Code Division 69B *e.g.* Fla. Stat. §§ 626.611(a)(b)(d)(g)(i)(j) and/or (k), 626.6115(1), 626.6115(2), 626.621, 626.731 and/or 626.9541.

134.     Defendant Insurers certifications for original and/or renewal appointments of John, IOA, Heath, Valli, and/or 1188 Partners to the FDFS that they had completed an investigation, reasonable under the circumstances, were false, or was so certified without proper internal procedures, standards, mechanisms and/or internal guidelines being followed and/or the same do not exist in such form to reasonably protect individuals, the public or other persons, such as Spagnuolo as required by Florida law.

135.     Defendant Insurers were on constructive notice as to any publicly filed information, documents, such as numerous civil lawsuits filed by numerous entities and individuals against John, Heath, IOA, 1188 Partners and Valli from 2010 through present, in which these Defendants had been sued for wrongful conduct which, at the very least, required reasonable investigation which was not performed, or which was performed by recklessness or which was performed in such manner as to provide these Defendants with material assistance to white-wash conduct that would otherwise require the Defendant Insurers to decline to certify fitness to the FDFS.

136.     In matters of public record, as was their duty upon appointment and reappointment, John, Heath, IOA, 1188 or Valli's fitness for qualifications which put the public and agents like Spagnuolo at risk of substantial harm.

137.     Upon information and belief, Defendant insurers intentionally and/or recklessly failed to comply with their statutory duties and made such certifications to the FDFS as to John, Heath, Valli, 1188 Partners and IOA with actual and/or constructive knowledge that these Defendants could cause foreseeable harm to other licensed individuals, entities, and the general public.

138.    Defendant Carriers each separately at two-year intervals provided false, misleading and/or intentionally incomplete reporting to the FDFA regarding IOA, John, Heath, Valli and 1188 Partners fitness and trustworthiness.

139.    Upon information and belief, the Defendant Insurer's conduct put their profits before their responsibilities and collected premiums on policies, as it relates to, from the TLE Account notwithstanding that they failed to comply with Florida law and/or their compliance was so deficient so as to constitute a constructive failure to comply with Florida law.

**Defendant Carriers are Subject to Mandatory Suspension or Revocation of their Certificates of Authority**

140.    Defendant Carriers must obtain and maintain a Certificate of Authority with the FDFS pursuant to Fla. Stat. 626.409.

141.    Defendant Carriers' Certificate of Authority, which includes the license to transact insurance business in Florida, and appoint agencies and agents in Florida, may be suspended or revoked for failure to make true and accurate statements to the FDFS, and otherwise make false certifications in appointing agencies and agents under Fla. Stat. 624.418.

142.    By appointing the Appointees such as to profit from the Quid-Pro-Quo Scheme, the Defendant Carriers have used such "methods and practices in the conduct of its business as to render transaction of insurance in [Florida] hazardous or injurious to its policyholders or to the public." Fla. Stat. 626.418(b).  The same is grounds for immediate suspension of the Defendant Carriers' respective Certificate of Authority.

**The Defendant Carriers Intentionally Refrained from Competing for Each Other's Share of the TLE Account because the Appointees had assured them Renewal Business**

143.    Each of the Defendant Carriers knew of and understood their role in the association-in-fact in that each was a strategic partner of the Appointees, and each received the guaranteed

premium allocation and the protection from competition that status afforded. In turn, each Defendant Carrier agreed to refrain from competing from the other Defendant Carriers' incumbent business as each knew the Appointees would likely send them policy renewals relative to the TLE Account and others.

144.    One of the mechanisms for allocating premiums that was agreed upon by the Appointees and each of the Defendant Carriers was the agreement relative to incumbent business. The Defendant Carriers and Appointees Associated-in-Fact and thus understood and agreed that when an account was due for renewal, the Appointees would steer the renewal to that particular Defendant Carrier.

145.    In so doing, the Defendant Carriers and the Appointees knew that the Appointees had devised a system whereby any competitive bidding was illusory and meaningless; that who would receive the renewal was a foregone conclusion even though the TLE policy holder believed that the Appointees' risk score system, for example, and the Appointees generally were truly looking out for the insured's best interest when, in fact, that was not true.

146.    Succinctly, the quid-pro-quo was that the Defendant Carriers knew and understood they would be receiving new and renewal policies from the TLE Account with no legitimate competition, so long as, they continued to rubber stamp appointments and transmit false information over interest wires and paid Appointees undisclosed commissions or kickbacks.

147.    From 2014 through 2023, the Defendant Carriers each transmitted over interstate wires fraudulent commissions under fraudulent undisclosed agreements on a regular basis, but no less than once a year to one or all of the Appointees.

**Conditions Precedent**

148.    All conditions precedent have been accomplished, waived or satisfied prior to the institution of this action.

149.    Plaintiff has retained undersigned counsel to prosecute this action and has agreed to pay a reasonable attorney's fee and costs.

150.    JURY TRIAL: Plaintiff demands a trial by jury on all claims so trailable.

**COUNT I - CIVIL VIOLATION OF**
**FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**("CIVIL RICO")**
**PURSUANT TO 18 U.S.C. § 1961, *et. seq.***
(Against the Defendant Carriers)

151.    Spagnuolo realleges Paragraph Numbers 1 through 150 as if fully and completely set forth herein.

152.    This is an action for civil damages pursuant to the Federal Racketeer Influenced and Corrupt Organizations Act **18 U.S.C. § 1961, *et. seq.* as against Defendants Valli, John, Heath and 1188 Partners ("RICO Defendants").**

153.    As set forth in the general allegations above, Count I involves:

a.    **DEFRAUDING PLAINTIFF THROUGH MANIPULATION OF BOOKS OF ACCOUNT BY THE APPOINTEES, AND THE DEFENDANT CARRIERS, FROM 2014 THROUGH PRESENT;**

b.    **THE DEFENDANT CARRIERS PROFITTED FROM THE ASSOCIATION-IN-FACT'S QUID-PRO-QUO SCHEME:** From 2014 through present, the Defendant Carriers and the Appointees engaged in a quid-pro-quo scheme where the Defendant Carriers certified Appointees as their appointed agents, and reappointed them in the same manner every 24 months, in exchange for TLE policies premiums and renewals being steered to each Defendant Carrier through an uncompetitive bid system which guaranteed each Defendant Carrier millions of dollars of premiums had lining their pockets with ill-gotten profits; and

c.    **THE RISK SERVICE FEE a/k/a RISK SCORE SCHEME** which directly and/or indirectly financially benefited the Carrier Defendants by

creating the illusion of the insured getting placed with the best policy, but in reality, was an uncompetitive system which steered premiums to the Carrier Defendants who collected monies on those premiums through the use of U.S. Mail and Interstate Wires.

**Applicable Statutes**

154.     This is an action for civil violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("Federal Civil RICO") pursuant to 18 U.S.C. § 1962(c) and §1964(c). which provides.

155.     Pursuant to 18 U.S.C. § 1962(c):

It shall be unlawful for "any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs for a pattern of racketeering activity or collection of unlawful debt.

156.     Pursuant to 18 U.S.C. § 1962(d), it shall be unlawful to conspire to violate any of the RICO substantive provisions, including section 1962(c).

157.     18 U.S.C. § 1964(c), creates a private right of action for any person injured in his business or property by reason of violation of § 1962 and provides for threefold the damages sustained including reasonable attorney fees.

**The Enterprise**

158.     Under Federal law, an "enterprise" is defined under 18 U.S.C. § 1961 as follows:

**(4)** "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

159.     The individual Carrier Defendants, the Appointees, and others associated in fact, such as 1188 Partners, LLC, IOA Group, LLC, and JKR Professional, LLC constitute an Enterprise (hereinafter the "Enterprise" or "Association in Fact Enterprise"), which functioned for the

purpose of defrauding the Plaintiff, TLE, other insurance companies and other IOA Agents, to line their own pockets through an overarching Quid-Pro-Quo Scheme as defined hereinabove.

160.    Each RICO Defendant conducted the affairs of the Association in Fact Enterprise or acted at the direction of the Appointees or the Defendant Carriers, in the conduct of the affairs of the Enterprise.

161.    The Enterprise is an ongoing organization which engages in, and whose activities affect interstate commerce.

162.    The Enterprise had longevity, over ten years, sufficient to permit each of the RICO Defendants to pursue the Enterprise's purpose.

**Function Together as Continuing Unit**

163.    At all times relevant hereto, members and associates of the Enterprise functioned together as a continuous unit, with a common purpose for the economic benefit and gain of the RICO Defendants who control the Enterprise at the expense of Plaintiff and other similarly situated individuals and/or IOA Clients as further described below.

164.    Each participant in the RICO Enterprise had systematic linkage to each other through corporate ties, contractual relationships, employment, financial ties and continuing coordination of activities.

165.    Each RICO Defendant conducted the affairs of the Enterprise or acted at the direction of Defendant Valli, John and/or Heath in the conduct of the affairs of the Enterprise.

166.    The Enterprise associates utilized Defendant Carriers and IOA as the vehicles for their racketeering activities.

167.    IOA is a legal entity controlled by the Appointees.

168.    1188 Partners is a legal entity controlled by Appointee John.

169. Based upon the RICO Defendants' unlawfully obtaining, transmitting, and collecting monies through the use of interstate mailings, the same affected interstate commerce in furtherance of the racketeering schemes as alleged herein.

170. From 2014 through present, Defendant Carrier Defendants each, in connection, participation and execution of the purpose of the Enterprise, caused at least 3 fraudulent transmissions to the FDFS to ensure that the Appointees could transact insurance and act as their agents in transacting insurance in furtherance of the Quid-Pro-Quo Scheme.

171. From 2014 through 2019, Appointees caused to be placed in the stream of U.S. Mail the fraudulent and misleading Commission Reconciliation Packages from March 2014 through January 2019.

172. From 2014 through 2019, Appointees sent Plaintiff false information over interstate wires in furtherance of concealing the Quid Pro Quo Scheme.

173. 1188 Partners was totally owned and controlled by Defendant John and was used as a mechanism to receive fraudulent commissions derived from the Fraudulent Agreements between the Appointees and the Defendant Carriers.

174. IOA and 1188 Partners were used as vehicles through which the RICO Defendants ran their Enterprise by engaging in over thirty (30) acts of mail or wire fraud – predicate activity in violation of 18 U.S.C. § 1341 and 1343.

175. The RICO Defendants had the specific intent to participate in the overall RICO enterprise, which is evidenced by the schemes to defraud Plaintiff, other IOA Agents and/or IOA Clients.

**Common Purpose**

176.    The members and associates of the Association in Fact Enterprise banded together with the common purpose: to enrich themselves at the expense of Spagnuolo, TLE corporation and TLE franchisees, and other insured they represent, through a pattern of racketeering activity which consistent of hundreds of acts of mail and wire fraud over the course of over a decade which was their regular way of conducting the affairs of the Enterprise towards the common goal of the overarching Quid Pro Quo Scheme.

177.    The RICO Defendants share the bounty of their criminal enterprise – by sharing the financial gain from their fraudulently obtained monies.

178.    The Defendant Carriers, their financial gain are the illegal profits generated through the Quid Pro Quo Scheme related to the TLE policy premiums paid to the Defendant Carriers, which Plaintiff demands to be disgorged as the fruits of the illegal acts as more fully described herein.

**Operation and Management/Distinctness**

179.    As described herein, the RICO Defendants participated in the operation and management of the RICO Enterprise by directing its affairs as described herein.

180.    While the RICO Defendants participated in –and are members of– the enterprise, they have a separate existence from the enterprise, as each individual Defendant Carrier is different than the Enterprise which they direct.

181.    The Enterprise is an association of these individuals, other individuals, and entities working collectively to defraud Plaintiff and others as set forth hereinabove and below.

182.    The Association in Fact Enterprise has existed for more than ten years and continues to exist and operate.

**The Racketeering Violation**

183.    From approximately November 2013, and continuing up through the date of the filing of this Complaint, the RICO Defendants –each of whom are persons associated with or employed by the Association in Fact Enterprise– did knowingly and unlawfully conduct or participate, directly or indirectly, in the Association in Fact Enterprise through a pattern of criminal activity within the meaning of  18 U.S.C. § 1961(5) (defining "pattern") and 18 U.S.C. § 1961(1) (defining "racketeering activity"), all in violation of 18 U.S.C. § 1962 ("Prohibited Activities").

184.    RICO Defendants have engaged in a pattern of racketeering activity by committing at least two acts of racketeering activity after the effective date of the statute, and also within ten (10) years after a prior incident of racketeering conduct. Defendants' actions: violated 18 U.S.C. § 1341 and § 1343 mail fraud and wire fraud.

**Pattern of Racketeering Activity**

185.    A 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

186.    Under Supreme Court law, *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989) each RICO Defendant must engage in a pattern of racketeering, as described above, which requires each Defendant meet the "continuity" plus "relationship" tests.

**Continuity Plus Relationship**

187.    Spagnuolo alleges that the course of conduct engaged in by the RICO Defendants satisfy both "continuity" and "relationship" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5).

188.     Spagnuolo can show the relatedness prong because the predicate acts have the "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise."

189.     All predicate acts had the same purpose of defrauding Spagnuolo, TLE corporation, TLE franchisees and other insured which the Appointees have received undisclosed commissions and whom have been steering through uncompetitive processes to the Defendant Carriers by the Appointees.

190.     The continuity of the pattern of racketeering activity constitutes closed-ended continuity as it occurred over a substantial period of time, i.e., from about December 2013 through February 2019 and up to the present, and involves, as described, multiple schemes and multiple victims as alleged hereinabove.

191.     Spagnuolo also alleges that the pattern of racketeering activity is shown by the threat of continued activity as the Appointees and the Carrier Defendants continue to operate the Quid Pro Quo Scheme, have active insurance licenses and appointments and/or Certificates of Authority grant to them under the FIC which they continue to sue to transact insurance in Florida to the detriment of Plaintiff and others as more fully described herein.

192.     Thus, engaging in the pattern of racketeering as set forth herein is the way Defendants regularly conduct the operations of the Association in Fact Enterprise and their predicate acts threaten future criminal conduct.

**<u>The Injury</u>**

193.     The Carrier Defendants have profited from the bounty of the TLE Account which was procured by and is owned by Spagnuolo, and but for their Associates-in-Fact's actions of manipulating IOA's CRM and entering into the Quid Pro Quo Scheme, the Carrier Defendants

would not have realized ill-gotten profits, nor would they have enriched Appointees with moneys derived from those ill-gotten profits in the form of illegal kick-backs and/or undisclosed commissions.

194.     The Carrier Defendants are strictly liable to Plaintiff for the profiteering engaged by them and all of the amounts paid to the Appointees, and also liable for damages caused to Plaintiff via their participation in the Quid Pro Quo Scheme.

**WHEREFORE**, Plaintiff demands judgment as to Count I against the **RICO Defendants** for compensatory and treble damages, pre- and post-judgment interest, attorneys' fees and costs incurred in bringing this action and for such other relief as this Honorable Court deems just and proper.

### COUNT II – CIVIL RICO CONSPIRACY – CIVIL VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("CIVIL RICO") PURSUANT TO 18 U.S.C. § 1962 (CONSPIRACY TO COMMIT PROHIBITED ACTIVITIES
(Against RICO Defendants)

195.     Spagnuolo repeats each of the allegations contained in Paragraphs 1 through 194 as if set forth herein at length.

**The Conspiracy**

196.     Plaintiff alleges that commencing in February 2014, and continuing until the present time, the RICO Defendants described above, conspired to violate 18 U.S.C. § 1962(c), all in violation of Fla. Stat. § 18 U.S.C. § 1962(d).

197.     Each Defendant agreed that a conspirator would conduct or participate in the affairs of the Enterprise through a pattern of racketeering, consisting of the predicate activity as more fully described in Count I.

198.    Plaintiff alleges that the conspiratorial objective of that mutual agreement was intended to obtain Plaintiff's interests in business and/or property, and that such conspiratorial conduct violates 18 U.S.C. § 1962(d), i.e., to conspire or endeavor to violate any of the provisions of 18 U.S.C. § 1962(c).

199.    Each RICO Conspiracy defendant intended to further the schemes to defraud, which as described in Count I were completed and satisfied by at least one substantive individual Defendant.

200.    As demonstrated in detail above, the RICO Defendants have engaged in numerous predicate racketeering acts in furtherance of the conspiracy as alleged in Count I.

201.    The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that each RICO conspiracy Defendant not only agreed to the objective of conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

202.    As a direct and proximate result of the RICO conspiracy Defendants' agreement that conspirators would violate 18 U.S.C. § 1962(c), Spagnuolo, and others similarly situated, has been and is continuing, directly and proximately, to be injured in their business or property as set forth more fully above.

**WHEREFORE,** Spagnuolo demands entry of judgment against RICO Conspiracy Defendants as to Count II and seeks an award of compensatory and treble damages, for attorneys' fees costs, and for such other further relief this Court deems just and proper.

## COUNT III - CIVIL VIOLATION OF FLORIDA'S RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## <u>PURSUANT TO FLA. STAT. § 772.104</u>
### (Against Defendant Carriers)

203.    Spagnuolo repeats and realleges Paragraphs 1 through 150 as if set forth herein.

204.    This is an action for civil violations of Florida's Civil Remedies for Criminal Practices Act, Fla. Stat. 772.104(1) against Defendants Carriers ("Civil RICO Defendants").

205.    Plaintiff alleges that the RICO Defendants have and continue to "(1) conduct or participation in an enterprise through (2) a pattern of [criminal] activity."[16]

206.    Pursuant to Fla. Stat. 772.104(1), Plaintiff alleges injury caused by and through the RICO Defendants' violations of Fla. Stat. 772.103(3) (the "Florida Civil RICO Act") which provides in relevant part:

> It is unlawful for any person:  Employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity…

207.    "[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose."[17]

208.    The RICO Defendants are associated with each other and/or with other individuals and entities, such as the Appointees and others, for the common purpose of profiting off an established Quid Pro Quo Organized Communication Fraud Scheme.

209.    This association-in-fact is therefore an enterprise within the meaning of **Fla. Stat. § 772.102(3).**

210.    Each and every Carrier Defendant conducted or participated in, or conspired to conduct or participate in, the affairs of their respective RICO Enterprises through a pattern of

---

[16] *Horace-Manasse v. Wells Fargo Bank, N.A.*, 521 F. App'x 782, 784 (11th Cir. 2013) (quoting *Lugo v. State*, 845 So. 2d 74, 97 (Fla. 2003)).
[17] *Boyle v. United States*, 556 U.S. 938, 948, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009).

numerous acts of racketeering activity defined under **Fla. Stat. § 772.102(1)(a)** and in violation of **Fla. Stat. § 772.103**, related by their common purpose to profit off insurance policy premiums referred by non-parties IOA, John, Heath and/or Valli without undertaking their statutory duty to investigate these or other individuals putting profit above all else, and in so doing, provided false and/or knowingly inadequate certifications to the State of Florida with regard to appointing agents which referred policy premiums to them.

211.    Specifically, each and every Carrier Defendant conducted or participated in, and/or conspired to conduct or participate in, the affairs of their respective RICO Enterprises by knowingly, or with reckless disregard, failing to undertake adequate statutory investigations before appointing agencies and insurance agents.

212.    More specifically, each and every Carrier Defendant has agreed, as a term of their own license to transact insurance, to be responsible for the acts of IOA, John, Valli, Heath, 1188 Partners and others at IOA as alleged herein.  From 2013 through present, the RICO Defendants, along with others, such as such comprise an Association In Fact Enterprise as they share structural features of: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose."

213.    From 2013 through present, the RICO Defendants shared the purposes of enriching themselves through the course of criminal conduct of Organized Fraud as alleged herein such as to steal, cheat and/or obtain through fraud and deceit Plaintiff's property, and that of other IOA agents to enrich themselves through ill-gotten money, financial benefits and rewards through an Organized Fraud and/or Communications Fraud Scheme ("IOA Organized Communications Fraud Scheme").

214.    In exchange for maintaining the IOA Organized Communications Fraud Scheme, each and every Carrier Defendant received a financial benefit in violation of  **Fla. Stat. 817.034,** which included, inter alia, mail fraud **(18 U.S.C. 1341),** wire fraud **(18 U.S.C. 1343),** federal and state money laundering **(18 U.S.C. 1957(a)(1)(A)(i)(B)(i)** and **Fla. Stat. 896.101(3)(a)(1)** and **(2)(a)),** False Entries in Books of Business **(Fla. Stat. 817.15),** cheating **(Fla. Stat. 817.29),** Theft **(Fla. Stat. 812.14),** and actions to conspire to commit violations of **Florida Chapter 517** related to Secured Transactions.

215.    These predicate acts of racketeering activity described above constitute a "pattern of racketeering activity" as defined in **Fla. Stat. § 772.102(4)** and furthered the common purpose of each and every Carrier Defendant's respective RICO Enterprise to profit from the IOA Organized Communications Fraud Scheme.

216.    Each and every Carrier Defendant's acts have yielded consistent results and caused economic injuries to Plaintiff.

217.    As set forth in the preceding paragraphs, the racketeering acts have similar participants.

218.    Each and every Carrier Defendant is an insurance carrier that received policy premiums from the TLE Account and provided insurance coverage with respect to numerous lines of coverage on the TLE Account and other accounts referred to them by non-parties IOA, John, Heath and others at IOA.

219.    Each and every Carrier Defendant regarding their respective RICO Enterprises directed their racketeering activities at common victims, IOA insurance agents, customers and clients.

220.    The acts of each and every Carrier Defendant have similar methods of commission, such as maintaining their deficiencies in investigating, evaluating, and enforcing policies and protocols regarding appointing insurance agencies and agents in order to maximize their profits.

221.    From 2013 through present, a period of over a decade, each and every RICO Carrier Defendant conducted or participated in the affairs of the IOA Enterprise directly, or through their agents, John Ritenour, Valli Ritenour, Heath Ritenour, IOA and/or 1188 Partners in the conduct of the affairs of the IOA Enterprise, such that each of the RICO Defendants committed at least 2 incidents of criminal activity within the previous five years prior to the filing of Plaintiff's complaint on May 9, 2019 and have since engaged in well over 2 incidents of criminal activity from May 2019 through present.

222.    As such, the RICO Defendants, and their associates-in-fact have operated as a continuous unit for over 10 years which establishes longevity sufficient to permit each of the RICO Defendants to pursue the IOA Enterprise's purpose.

223.    The members of the IOA Enterprise functioned together as a continuous unit with a common purpose for the economic benefit and gain of the RICO Defendants who control the IOA Enterprise through a course of criminal activity.

224.    The IOA Enterprise affected in-state and interstate commerce based upon Defendants' unlawfully obtaining, transmitting, billing, and collecting monies through use of interstate mailings and wirings and otherwise transmitting mailing and wirings in furtherance of the racketeering scheme.

225.    More specifically, John, as an independent agent, Heath as an independent agent, 1188 Partners as an independent agent since May 2019 and IOA as a private insurance brokerage, wrote and placed insurance for TLE Corporate and Franchise Centers across the United States

from 2014 to present. Based on that activity, IOA was paid through in-state and interstate wires monies reflecting, in part, agency commissions, insurance producer commissions and deceptively procured revenues.

226.     Each participant in the IOA Brokerage Enterprise had systematic linkage to each other through corporate ties, contractual relationships, employment, financial ties and/or continuing coordination of activities.

**The Pattern of Racketeering/Criminal Activity**

227.     The RICO Defendants have engaged in a pattern of racketeering activity by committing at least two acts of racketeering activity, which did not occur at the same time, where in fact separate incidences and occurred after the effective date of Fla. Stat. 772.102(4), 772.103(3) and 772.104 and also within five (5) years after a prior incident of racketeering conduct.

228.     These incidents occurred over at least the last 10 years and did not occur at the were connected and interrelated to the common purpose and goals of the Enterprise as defined herein above.

229.     Each RICO Defendant engaged in Criminal Activity information as defined by pursuant to Fla. Stat. § 772.102(1)(a) and (b), meaning the RICO Defendants participated in conduct to commit, attempt to commit, conspire to commit or to solicit, coerce, or intimidate another person to commit crimes chargeable by indictment or to achieve their share purposes of enriching themselves.

**Specific Predicate Criminal Activities**

230.     More specifically, the RICO Defendants each separately, pursuant to Fla. Stat. 626.415, stand in the shoes of the Appointees, and have thus engaged in Criminal activity pursuant to 772.102(a) with respect to:  Organized Fraud and/or Communications Fraud, pursuant to Fla.

Stat. 817.034, which included, *inter alia,* mail fraud (18 U.S.C. 1341), wire fraud (18 U.S.C. 1343), False Entries in Books of Business (Fla. Stat. 817.15), cheating (Fla. Stat. 817.29), Theft (Fla. Stat. 812.14), and actions to conspire to commit violations of Florida Chapter 517 related to Secured Transactions.

231.    Plaintiff has alleged in detail and particularity the conduct offensive to various criminal activities in violation of Fla. Stat. 772.102(1) and 772.103(3), which is correspondingly violative of Fla. Stat. 895.03(3).

232.    Each and every RICO Defendant Carrier, conspired and/or participated in criminal activity, by sending via wires or mails certifications of the Appointees to the FDFA that they had conducted an investigation and concluded that they were of good moral character, trustworthiness and fitness to be so appointed under Florida's insurance code at least two times in the last ten years for purposes of reaping profits.

233.    Each and every RICO Defendant Carrier also participated in the criminal activities as defined herein pursuant to Fla. Stat. 626.451(2) and (3) as  all of the Schemes alleged herein above, through Organized Fraud and/or Communications Fraud, which include the separate acts of , mail fraud (18 U.S.C. 1341), wire fraud (18 U.S.C. 1343).

234.    **Theft, Cheating along with Organized Fraud and Communications Fraud**: On December 22, 2023, documents previously concealed from Spagnuolo revealed that John had lied in his January 2019 email to Spagnuolo as he had been receiving insurance producer commissions from the TLE Account to the turn of well over $1,000,000 since 2019. These documents also established that Heath had knowingly and wrongfully been receiving monies owed to Spagnuolo. Underlying these payments to the Appointees, are hundreds of wire transfers of monies to IOA in the form of insurance agency and producer commission otherwise owed, in total or part, to

Spagnuolo. Each and every one of these hundreds if not thousands of wire transmissions constitute an independent act of Organized Fraud, Communications Fraud, Wire Fraud, Theft, Cheating, False Entries of Books perpetrated by John, Heath, IOA, Valli and 1188 Partners as the "original sin" was the fraudulent listing of John as Lead Agent on the TLE Account in late 2013.

***Money Laundering***

235.     Pursuant to Fla. Stat. 626.451(2) and (3), the RICO Carrier Defendants participated in and/or were associated with committing acts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) by and through the acts of the Appointees conducted with the scope of their duties under the Code.

236.     By and through the acts of the Appointees, the RICO Carrier Defendants knowingly conducted financial transactions, as described in detail above and at the time this occurred, they directed and executed those transactions, each of the RICO Carrier Defendants knew the property involved represented the proceeds of some form of unlawful activity.

237.     The property involved in those financial transactions was in fact derived from specific unlawful activity within the meaning of 18 U.S.C. § 1956(a)(1) and (c)(7).

238.     The RICO Carrier Defendants knew those transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specific unlawful activity within the meaning of 18 U.S.C. § 1956(a)(1)(B)(i) and (c)(7).

***Pattern of Racketeering Activity***

239.     These various incidents of criminal activity alleged herein by each individual RICO Defendant have the same or similar intents, results, accomplices, victims, and/or methods of commission and otherwise are interrelated by distinguishing characteristics. They are not isolated incidents.

240.   The course of conduct engaged in by the RICO Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in Fla. Stat. § 895.02(7).

241.   The predicate acts have similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise Association in Fact. All predicate acts had the same purpose of defrauding Spagnuolo and other investors/agents of millions of dollars, all for the personal enrichment of the Defendants and their associates.

242.   In fact, engaging in the pattern of racketeering as set forth herein is the way Defendants regularly conduct the operations of the IOA Enterprise and their predicate acts threaten future criminal conduct.

243.   Furthermore, the RICO Defendants continue to engage in these predicate acts to harm Plaintiff and other agents, which establishes a threat of long-term racketeering activity and evidences the continuity of Defendants' open-ended pattern of racketeering activity.

244.   The RICO Defendants, and Defendants Valli and John in particular, profited directly or indirectly from the enterprise.

245.   Plaintiff was directly harmed as a result of the conduct alleged herein, and, in particular, as a result of these criminal activities and deceptive practices, which deprived him of rightfully earned commissions on the TLE account.

246.   Plaintiff, proximately and directly, suffered substantial damages in the form of unpaid commissions.

**WHEREFORE**, Spagnuolo demands judgment for damages, treble damages, attorney's fees and costs, and temporary and permanent injunctive relief as set forth in the causes of action which follow pursuant to Fla. Stat. 895.05(6) and 895.05(1)(a) through (e), and for such further relief as

this Court deems just and proper.

### COUNT IV- CIVIL VIOLATION OF RICO PURSUANT TO FLA. STAT. § 772.103(4) -CONSPIRACY TO COMMIT PROHIBITED ACTIVITIES

247.    Spagnuolo repeats and realleges Paragraphs 1 through 150 and 203-246 as if set forth herein.

248.    Beginning in 2013 and continuing until the present time, the RICO Conspiracy Defendants conspired to violate Fla. Stat. § 772.103(3), all in violation of Fla. Stat. § 772.103(4).

249.    Each agreed that they would conduct or participate in the affairs of the IOA Enterprise through a pattern of racketeering, consisting of the predicate activity as more fully described in Count I.

250.    The conspiratorial objective of that mutual agreement was intended to obtain Spagnuolo's interests in business and/or property, as well as that of other agents, and to artificially inflate IOA's stock price, and that such conspiratorial conduct violates Florida Statute § 772.103(4), *i.e.*, to conspire or endeavor to violate any of the provisions of subsection (3).

251.    Each RICO Conspiracy Defendant intended to further the schemes to defraud, which as described in Count I, were completed and satisfied by at least one RICO Defendant. The RICO Defendants have engaged in numerous predicate racketeering acts in furtherance of the conspiracy including predicate acts/criminal activities consisting of theft, cheating, mail fraud; wire fraud (which is conduct defined as "racketeering activity" under 18 U.S.C. § 1961(1) as prohibited in Fla. Stat. § 895.02(8)(b)); and violations of Fla. Stat. § 895.02(8)(a)(11) (relating to sale of securities); Fla. Stat. § 895.02(8)(a) (relating to fraudulent practices, false pretenses, fraud generally); and Fla. Stat. § 895.02(8)(a)(relating to tampering, harassing and retaliation against a witness or victim).

252.     The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that each Defendant not only agreed to the objective of conspiring to violate Fla. Stat. § 772.103(3), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

253.     As a direct and proximate result of the RICO Conspiracy Defendants' agreement to violate Fla. Stat. § 772.103(3), Spagnuolo has been and is continuing, directly and proximately, to be injured in his business or property.

**WHEREFORE,** Spagnuolo demands judgment against the RICO Conspiracy Defendants for compensatory and treble damages, pre- and post-judgment interest, attorneys' fees and costs, and for such other further relief as this Court deems just and proper.

<u>**COUNT V**</u>
**TEMPORARY AND PERMANENT INJUNCTIVE RELIEF**
**UNDER THE FLORIDA RICO ACT, F.S.A. § 895.05 "CIVIL REMEDIES"**

254.     Plaintiff hereby asserts and realleges allegations as to Paragraphs 1 through 253.

255.     The Defendant Carriers are also liable for violating section 895.01, *et seq.*, the Florida RICO Act, and specifically Section 895.03(3).

256.     Plaintiff alleges that the Defendant Carriers are not only liable for criminal racketeering acts of submitting false, misleading and/or intentionally incomplete certifications to the state of Florida as to their Appointees character and trustworthiness over interstate wires, but they also are strictly liable for the conduct of their Appointees for illegally steering insurance business through their in-house bid-rigging activities pursuant to Fla. Stat. 626.451(3).

257.     Plaintiff is demanding, immediate and permanent injunctive relief pursuant to the Florida Criminal RICO Act, Section 895.05(1) and (6) which provides a private right of action for statutory injunctive relief which includes the suspension of the Defendant Carriers Certificates of

Authority, the freezing of the bounty of criminal activity and, if appropriate, to suspend all of the Defendant Carriers' business activities in Florida and revoke their charter to do business in the State of Florida, especially where they have abused and abdicated their super-fiduciary duties by appointing and reappointing individuals and entities like the Appointees evidencing that profits are more important to them than the rule of law.

258.    Florida's Criminal RICO Act is distinct from the Federal RICO Act in that it specifically and plainly provides for immediate and meaningful statutory injunctive relief on a codified standard which supplants common law standards for obtaining injunctive relief to a showing of an immediate danger of substantial harm or damage to stop racketeers from profiteering off the backs of the victims of their illegally organized, systemized and normalized patterns of racketeering activities.

259.    The Defendant Carriers, through the pattern of racketeering described in Count I hereinabove received proceeds that he used, directly or indirectly, in the acquisition of rights, interests, equity or control in real property or in the establishment or operation of an enterprise.

260.    Under Section 895.05(6) allows *any* aggrieved person to seek temporary and/or permanent injunctive relief pursuant to Section 895.05(1)(a)-(e), which provides that: "(1) Any circuit court may, after making due provision for the rights of innocent persons, enjoin violations of the provisions of s. 895.03 by issuing appropriate orders and judgments, including, but not limited to: (a) Ordering any defendant to divest himself or herself of any interest in any enterprise, including real property."

261.    To the extent that the Carrier Defendants violations of sections 772.103(3) and 895.03(3) have resulted in obtaining or maintaining an interest in TLE Accounts or other affiliated

enterprises operated by IOA, the Court should order injunctive relief sought by Plaintiff pursuant to Fla. Stat. 895.05(1)(a)-(e).

**WHEREFORE**, Plaintiff Spagnuolo demands immediate and permanent injunctive relief as set forth herein, pursuant to Fla. Stat. 895.05(1)(a)-(e), including, but not limited to, orders requiring the Carrier Defendants and all other appropriate equitable relief available under the Civil Remedies provision of the Florida RICO Act to be determined on a preliminary basis.

## COUNT V - NEGLIGENCE

262.    Spagnuolo repeats and realleges Paragraphs 1 through 150 as if set forth herein.

263.    At all times material hereto, Carrier Defendants owed a non-delegable duty of reasonable care in the investigation, inspection, oversight of the insurance premiums and commissions of the TLE Account.

264.    At all times material hereto, Carrier Defendants owed a non-delegable duty of reasonable care in the investigation, inspection, and oversight of the non-parties John, Heath, Valli, 1188 Partners, LLC and their management and conduct of the TLE Account.

265.    At all times material hereto, Carrier Defendants had actual or constructive knowledge of the mismanagement, fraud, and/or improper calculations and payments on the TLE Account by non-parties John, Heath, Valli, 1188 Partners, LLC.

266.    Carrier Defendants breached their non-delegable duties.

267.     As a direct, proximate and foreseeable result of the Carrier Defendants' breaches as alleged herein, Plaintiff has suffered damages.

**WHEREFORE**, Spagnuolo demands judgment as to Count V of the Complaint and for an award of compensatory damages, interest, and costs and for such further relief as this Court deems just and proper.

## JURY DEMAND

Spagnuolo demands a trial by jury on all issues so triable.


Dated: March 15, 2024




**VERIFICATION**

Under penalty of perjury, I declare that I have read the foregoing and the facts alleged in herein are true and correct.

Louis D. Spagnuolo
Dated: _____


Respectfully submitted,

**FARROW LAW, P.A.**
*Attorneys for Plaintiff*
1 Alhambra Plaza, Penthouse
Coral Gables, Florida 33134
Telephone: (954) 252-9818
jay@farrowlawfirm.com
service@farrowlawfirm.com

BY: **/s/Jay L. Farrow, Esq.,**
        JAY L. FARROW, ESQ.
        Florida Bar No. 625213