# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 24-CV-60422-SMITH/HUNT

LOUIS SPAGNUOLO, an individual,

          Plaintiff,

vs.

AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY, CHUBB CUSTOM INSURANCE COMPANY, DEPOSITORS INSURANCE COMPANY, GERBER LIFE INSURANCE COMPANY, HARLEYSVILLE INSURANCE COMPANY, HARTFORD CASUALTY INSURANCE COMPANY, IRWIN SIEGLE AGENCY, INC., MARKEL AMERICAN INSURANCE COMPANY, MARKEL INSURANCE COMPANY, NATIONWIDE INSURANCE COMPANY OF AMERICA, NATIONWIDE MUTUAL INSURANCE COMPANY, PHILADELPHIA INDEMNITY INSURANCE COMPANY, SAFEPOINT INSURANCE COMPANY, TRUMBULL INSURANCE COMPANY, TWIN CITY FIRE INSURANCE COMPANY, ZURICH AMERICAN INSURANCE COMPANY OF ILLINOIS, FTI CONSULTING, INC. and JOHN DOE(S), known person(s)/corporation(s),

          Defendants.

_____

## <u>VERIFIED EMERGENCY MOTION FOR RESTRAINING ORDER PURSUANT TO FLA. STAT. 895.05(6) AND/OR INHERENT POWERS REGARDING (1) ATTEMPTS TO BREACH COMPUTER DATABASES; (2) CYBER-ATTACKS WHICH INTERFERE WITH SCHEDULED HEARINGS; AND (3)TO PROHIBIT TRANSMISSION OF THREATENING MESSAGES IMPLYING HARM TO COUNSEL'S INFANT CHILD</u>

**COME NOW**, Plaintiff, LOUIS SPAGNUOLO, ("Plaintiff" or "Spagnuolo"), and undersigned counsel, Jay L. Farrow, by and through undersigned counsel, and Fla. Stat. §895.05(6) and/or this Court's inherent powers, and in support thereof, state as follows:

1

## **NATURE OF EMERGENCY**

**Nature of Emergency**.  Since the filing of Plaintiff's Amended Complaint on May 28, 2024, [D.E. 29] Defendants FTI Consulting, Inc. ("FTI")[1], several of the Insurance Carrier Defendants[2] and FTI's other clients, the Carriers' Appointees, Insurance Office of America, Inc.[3], Heath Ritenour and John Ritenour, created and began to execute a continuous, organized, and criminal crisis management strategy to intimidate, harass and terrorize undersigned counsel and his wife, undersigned's law firm and his client, Plaintiff Louis Spagnuolo.

FTI's website and press releases state that numerous of its Senior Managing Directors are former federal agents with backgrounds in cyber-security[4], cyber-counter intelligence offensive technology and hacking trainings.[5]

---

[1] According to is website as of January 2024: "FTI Consulting, Inc. is a global business advisory firm dedicated to helping organizations manage change, mitigate risk and resolve disputes: financial, legal, operational, political & regulatory, reputational and transactional. With more than 8,000 employees located in 31 countries, FTI Consulting professionals work closely with clients to anticipate, illuminate and overcome complex business challenges and make the most of opportunities. The Company generated $3.03 billion in revenues during fiscal year 2022. In certain jurisdictions, FTI Consulting's services are provided through distinct legal entities that are separately capitalized and independently managed. For more information, visit www.fticonsulting.com."

[2] Most of the Insurance Carrier Defendants are publicly traded companies, with hundreds of millions to over a billion dollars a year, and are current or former clients of FTI.

[3] According to its website as of June 21, 2024, "Insurance Office of America (IOA) is the fourth largest privately held insurance brokerage in the United States. Founded in 1988, IOA is a recognized leader in providing property and casualty, employee benefits, and personal lines insurance and risk management solutions as well as insurtech innovation. Headquartered in Longwood, Florida, part of the greater Orlando community, IOA has more than 1,400 associates located in over 60 offices in the U. S. and United Kingdom."

[4] https://www.streetinsider.com/Globe+Newswire/Former+Director+of+FBI+National+Cyber+Investigative+Joint+Task+Force+Joins+FTI+Consulting/20572367.html

[5] 2019 Ronald Yearwood as a Senior Managing Director in San Francisco. Chief Hacker. https://markets.businessinsider.com/news/stocks/fbi-s-chief-hacker-joins-fti-consulting-s-growing-cybersecurity-practice-1028077916

On June 3, 2024, Plaintiff's undersigned counsel received a text message from Verified Number leaving a text picture of him holding his son the day he was born, 21 months ago, which was followed by a series of phishing emails to his business and at least two person emails – which if opened can implant virus or allow data to be stolen. An investigation into this extremely disturbing call and text revealed that the picture was not taken by the undersigned or his wife, and it was never posted on social media by family members.  On June 3, 2024, the undersigned's wife was out of town and would be for the next few days.   Given that whomever had the technological capabilities to be able to send a text from a phone number that did not belong to them, and FTI, the Amended Complaint alleges that the Carrier Defendants are engaged in a multi-billion dollar Insurance Cartel Enterprise, undersigned began to scramble as he had an in person hearing the following day in Broward County, which would mean that his infant would be alone with the daytime caretaker.

More specifically, the June 4, 2024 in person 4-hour evidentiary hearing had been scheduled in a separate Broward Circuit Case for over 5 months by a filed Court Order in Arias v. Marenco, CACE-23-020509.   Undersigned counsel was required to spend significant time writing an emergency motion to cancel the hearing, and also one the following day.

Since June 3, 2024, these anonymous calls to the undersigned's private cell phone, with the one or two photos, come in tandem with a similar pattern of phishing emails and phishing text messages at dates and times coinciding within 24 hours or less of an upcoming hearing, court deadlines or calendar events.  After June 6, 2024, the dated Plaintiff filed his Amended Injunction Motion, these calls with the text pictures, along with the phishing emails increased dramatically, and a pattern began to emerge that there was an intentional scheme to interfere with undersigned's

schedule.   And, a clear intention to drain undersigned and his wife with the inference that someone was going to harm their child.

These instances where most frequent within the following 24 hours, or less than two hours or less than one minute before commencement of hearing.  On June 11, 2024, undersigned had revised a form draft of a motion to be filed before this Court seeking additional time to serve the original defendants which was filed on June 12, 2024, however, due to an apparent syncing issue within undersigned's computer system which began around June 5, 2024, the original draft was filed causing this Court to waste resources denying that motion on June 12, 2024.

Starting on or about June 12, 2024, in addition to undersigned receiving malicious communications, Plaintiff began to received emails from the Florida Department of Financial Services ("FDFS") indicating that someone was trying to log into his licensed insurance agent account portal.   Now both the undersigned and his client were being targeted on dates that cause substantial interference with undersigned's work schedule and that of his staff in that these cyber-targeting coincided with undersigned counsel's with deadlines in this case.

On Monday June 17, 2024, there was a critical hearing scheduled in a case where Plaintiff is suing FTI's clients in Seminole County at 10:00am.   Just before 8am, the undersigned's paralegal received a request purportedly from the general magistrate for a copy of the Complaint which was the subject of a motion to dismiss at 10:00 am.  At 8:05 am, minutes later, Plaintiff received another email from the FDFS indicating someone was attempting to log in to his account.   At 8:20am the undersigned's paralegal forwarded the Complaint, but the email return had a huge warning on the top stating that this email did not come from the 18th Judicial Circuit and warning further to be cautious of phishing.  Before 9 am, undersigned received another call before 9am with one of the two photos of him holding his son the day he was born, and there after began receiving over 10

4

phishing emails, the last three of which came in a precisely 9:59am indicating that his twitter account had been hacked, forcing the request for a continuance *ore tenus*. And while undersigned wrote text messages alerting opposing counsel, including the picture and explaining the situation, he said he had nothing to do with it and he was going forward.

On Monday June 17, 2024, in the afternoon, the same paralegal who received the suspicious request at 7:55 in the morning, reported that she could not log into pacer to file notices of service of the original defendants in this case, which delay resulted an order to show cause, and likely that undersigned's paralegal requires inspection.  On June 19, 2024, undersigned received another call, and approximately 30 phishing emails and in reviewing the order to show case entered by this Court, it began to come clear there has been an organized collaboration to break into undersigned's cell phone, his family's phones, his computer and his law firm's network, as well as, his client's account with the DFS.

Undersigned has owned Farrow Law since 2008, and within those sixteen years, nothing remotely like this has ever happened before.  In just over two weeks' time, this cyber-warfare has cost tens of thousands in lost income, thousands in the rescheduling of the workflow of the office due to lost and unusable time, adverse orders from this court which have required the expenditure of more time and time spent preparing motions such as the instant emergency motion and others.

Undersigned having reviewed the course of events, the pattern of conduct, the timing of the conduct, the effect it has had upon interfering with the orderly functioning of the law firm and that in just over two week's time, with more phishing emails being received yesterday June 20, 2021 which was also during a time when hours were spent reviewing and checking computers that were apparently slightly compromised to have obtained the passcode to PACER from June 17, 2024.

Notwithstanding its uniqueness, in addition to having to prepare and filing motions with courts seeking delays, undersigned has had to spend time speaking with clients regarding moving hearings, as well as, hours of work with IT services, hours of private review of client files, and sleepless nights with his wife watching over the home for suspicious activity.   While undersigned cannot comment on any investigations emanating from this activity, he can share that because of the incident on Monday, the IT team is continuing to work on systems, computers and devices today and for the foreseeable future to protect confidential information yet as another week approaches, undersigned was forced to file notices of unavailability to handle, stabilize the firm's work flow and review protocols and standard operating procedures, yet even this early morning additional phishing emails continue to be received and one small error in accidentally opening one of them would be catastrophic and unless this Court enters a restraining order, FTI, and its associates, have found an effect means of grinding work to  halt which they have filed a motion to compel depositions in their offensive SLAPP lawsuit.

**Time for Order** – Plaintiff and undersigned counsel request the order be entered immediately upon the review by this Court of this motion, and that a very limited restraining order be executed until further order of this Court.   The restraining order requests, *inter alia,* that Defendants do not transmit photographs of minor children to undersigned or his staff, that they refrain from purposely sending phishing emails and other communications which are directed to gaining access to undersigned's database or passwords, or would allow any monitoring of undersigned's activities other than what is in the public record.   Given that there has been a clear pattern of identical occurrences, identical timings, multiple individuals being targeted, and that the evidence by FTI's own press releases and website demonstrate they would be the ones with the capabilities to precisely engage a cyber-attack prior to court hearings and deadlines, which have substantially

interrupted undersigned practice every time they occur, and there has been no indication that any of this conduct to cease unless an immediate order is entered by this Court as soon as it receives, reviews and decides it be appropriate to enter a very limited temporary restraining order as there is nothing more dangerous that the intentional hacking of opposing counsel's computer systems or using timed cyber-attacks to prevent undersigned from representing his clients – it is malicious – it is unethical – and there should be no delay in entering this order.   Indeed, it took until yesterday, June 20, 2024, to understand the implications of what occurred June 17, 2024, and with a restraining order in place, the same provides some protection to take remedial and investigative action, and to add to any reports to appropriate agencies that were taken immediately upon the most highly suspicious activities.

The order should also be entered due to the trauma being caused to undersigned, and particularly, his wife who is an attending physician and medical director of pediatric transplant, and adult liver and bowel transplant programs at a local and internationally renowned transplant center.  And, perhaps, when she saw this photo when she did and where she did, and having demanded to know the general mechanics of having someone be able to do that – where there are no real answers, the correlation between that photo, and the meaning behind it, was immediately associated with all of those babies whom she had care for, and died after she had known them through no fault of their own invoking a traumatic response asking when is this going to end.

## STATEMENT OF VERIFIED FACTS

1.  Undersigned makes the following verified statements upon personal knowledge.

2.  On May 28, 2024, Plaintiff filed his Amended Complaint.

3.  On that same day, given the nature of the allegations, the known capabilities of the Defendants' international resources, and that serious issues involving ongoing domestic and

international criminal activities were involved, undersigned counsel contacted via text message from his personal cell phone, an individual whom he believed could direct him to the most effective means to submit information related to criminal activities that likely involve federal and national security issues whom he had met clerking for the Miami-Dade State Attorney's Office in 1999, and now works for the Justice Department in Miami.

4.   Plaintiff's counsel did not share that information with any of the Defendants or their counsel, nor has he or will he discuss anything other than this initial step was taken.   That said, the undersigned has shared with FTI's counsel, one of the Carriers' counsels, and perhaps one of Appointees' counsel, his sharing of information related to this action with others in Washington prior to May 28, 2024.

5.   On June 3, 2024, Plaintiff's counsel received a call from a verified number from 401-74X-XXXX, which he did not answer because the number was not recognized. However, a text message was left on his private cell phone number with two photographs of Plaintiff's counsel holding his newborn baby, with his phone in his lap – which moment was captured over 21 months ago.

6.   That photo, taken at the hospital is neither a photo on Plaintiff's counsel's phone, nor this wife's phone, and was not posted on social media. A copy of the picture is not being attached, but it has been provided to the Appointees' counsel, and one of the Carriers' counsel, Christoper Oprison via email.   The two photographs received are of undersigned on the date of his son's birth of him holding his son, sitting on a hospital chair, with his cell phone in his lap, and undersigned has and will make these photographs available prior to and at the hearing on this matter.

7.   On June 3, 2024, immediately after receiving this photograph, the undersigned reached out to opposing counsel in case pending in Broward County, Florida which was scheduled for a 4-hour hearing on June 4, 2024 – which had been scheduled for over four months. In fact, on February

11, 2024, by Court Order filed of record in that case on that same day, said hearing was set to commence on June 4, 2024 in person, with undersigned's client and other witnesses.

8.   At that time, the undersigned's wife had traveled out of town, which would not otherwise have been an issue, but for the fact that undersigned received this photo less than 24 hours before that hearing.   Ultimately, undersigned counsel had to file a motion with the court alerting to the situation and due to the fact that undersigned was unavailable on June 4, 2024, the hearing continued and requires another hearing to resolve adverse consequences.   However, on June 4, 2024, while certainly the photograph was reported, at that time, while undersigned believed it could be FTI or one of the Appointees associates, there was simply no patten which provides the fingerprints of whom is highly likely to have perpetrated these coordinated attacks.

9.   On June 5 and 6, 2024, the undersigned and his staff noticed issues with our computer system, acting slow, or not syncing, and some emails had to be sent twice, I contacted our IT department who determined that, while outside influences may affect speeds, there were no visible intrusions from the phishing emails or another breach.

10. On June 6, 2024, one of the Carrier Defendants' counsel, Christopher Oprison, of DLA Piper, emailed undersigned at 1:31 am., copying all other counsels who have either made appearances, requested admission pro hac vice or who are working on this matter for one of the Defendants.

11. Mr. Oprison's email related to the filing of a motion to extend deadlines for responses to the Amended Complaint, and to determine if Plaintiff agreed that the original injunction motion had been mooted and a couple other issues.

12. Undersigned responded at 3:14 am agreeing to the requested extension, informing that Plaintiff would be likely filing an amended injunction motion and indicating that once that amended motion was filed, the other issues related to the Amended Complaint could be discussed.

13. On June 6, 2024, Plaintiff filed the Amended Motion for Injunction [D.E. 34], and thereafter undersigned began to get more descript emails indicating that an individual had opened his Apple phone and other alerts that indicated that a specific account or vendor required immediate attention. Notably, from June 6 through 12, 2024, issues arose with respect to technical syncing issues, slow retrieval of internal files, more phishing emails, and phone calls from Verified unidentified individuals where the photo would appear, undersigned would block the number and thereafter, the photos would disappear from those calls.

14. On June 11, 2024, at 11:59 pm, Mr. Oprison sent undersigned an email as to who was going to prepare the motion to continue certain deadlines, and undersigned responded he believed that Defendants' counsel had agreed to do the same and Plaintiff had no objection. However, on June 12, 2024, the original deadline to meet and confer, undersigned received another email from Mr. Oprison at 1:36 pm claiming to be following up on the email of June 11, 2024, which Plaintiff's counsel believed he had answered the inquiry twice.

15. Notwithstanding, less than three hours later, on June 12, 2024, undersigned responded to Mr. Oprison in an email which stated in relevant part:

> Chris - have you been experiencing issues with your computer or email. I have been, since the filing of the Amended Complaint and subsequently after the Amended Injunction, receiving a substantial amount of emails regarding mobile devices I do not have and verified phone calls to the cell I do have which leave me text messages like the one below.
>
> I thought I sent you a message requesting that you prepare that motion, and I am having my team look through who has accepted service and who has not, because I know we sent out emails after

the amended complaint was filed to those whom had not accepted service as of yet.

16. In that same email of June 12, 2024, after the above exchange, as undersigned had received the photo of his son more than once, and had already disclosed the issue in an emergency motion in the Broward Case to attempt to move the June 4, 2024 hearing, undersigned sent Mr. Oprison the photo, and pointed out that this was a technical feat, and that whomever was responsible would likely want recognition, meaning, it should not be hard to find the skilled individuals on the Defense side that directed this to undersigned.

17. Moreover, undersigned's sending the photo on June 12, 2024, was for purpose of direct notice to Mr. Oprison of the situation such that there would be no issue that the Defendants in this case, whether they were directly, indirectly or otherwise completely not responsible for the picture, would be later surprised of an untimely disclosure. Undersigned continued:

> He's cute, isn't he?  Can't believe he'll be 2 soon...seems like yesterday I was holding him in my arms the day he was born, and as grateful as I am for the person who has been sent me these, it is annoying and disrespectful.  22 years in this business, and no one has been able to pull off a hat trick like that...and if your going to go through all that effort, I would imagine they want some recognition.

18.  Mr. Oprison did not respond to the photograph which was notable as one of FTI's strategic communications strategies is not to acknowledge the counteroffensive cyber-attack measures for engaging in such discussions lends itself to unwanted disclosures or admissions.

19. On June 13, 2024, undersigned received an email from his client in this matter, Plaintiff Louis Spagnuolo, which indicated that he received an email from the FDFS alerting him that someone was trying to gain access to his account which holds his personal information regarding his insurance licenses.

20. On that same date, June 13, 2024, undersigned received a June 13, 2024 Order Denying a Motion for Extension to Serve Defendants which was filed on June 12, 2024. However, that motion was not the version of the motion which was intended to be filed.

21. On June 13, 2024, Undersigned, called IT support again, who said, perhaps due to the rain and weather, the syncing could have been affected, but more likely are various "tricks of the hacking trade" which can slow down systems without breaching through the firewall.

22. The undersigned asked him to check if the firm's systems were operating normally and if any suspicious activity was detected. IT support indicated that while he could not see anything that would indicate a system breach, with the appropriate level of sophistication, specifically from a specially trained former federal agent involved in law enforcement, or national security, it was possible to interfere without necessarily setting off a breach alarm.

23. On Monday June 17, 2024, this unprecedented, repetitive and illegal cyber-attack was the most intense and brazen.   More specifically, in the two hours before a court-ordered 10am hearing upon Appointees' motion to dismiss[6] Plaintiff's lawsuit in Seminole County, Florida:

> (1) a phone call and picture were directed at undersigned counsel; (2) at 8:07am, Plaintiff received another email from the FDFS indicating someone was attempting to have him enter an access code such that his password to the online insurance portal could be changed; (3) undersigned received over twenty phishing emails between three email accounts with the most urgent messages to date; (4) by 9:14am, undersigned was experiencing messages that the firm's or his personal social media accounts had been breached, and (5) with three emails sent at 9:59 am, one minute before the hearing, stating that undersigned's twitter account had been hacked, and with others indicating that undersigned's entire system was compromised and needed emergency attention.

---

[6] Notably, this was a critical hearing for several reasons. First, Appointees were looking to have the claims against them for Racketeering dismissed with prejudice in state Court while a motion is pending in the middle district of Florida under Rule 60(b) which establishes, without any denial, that Appointees and the Counsel purposely withheld inculpatory discovery documents and manipulated the documents that were produced.

24. Around 9am, on June 17, 2024, undersigned received a call from opposing counsel, and responded to him in text messages from 9:14 through 9:23:

> I have gotten this photo texted to me again through a verified number and its happened since day before I filed injunction motion. I am waiting for hearing to start but after…I'm doing what is necessary. I brought this to Chris Oprison last week..no response,. I'm not going to be intimidated. [Louis Spagnuolo] has had some (sic) try to break into his Florida Insurance Online Account last week. My computers were full of phishing emails last week, Judge Spryenski (sic) picture still on that website [Laws in Florida. And, like [IOA, Heath and John Ritenour's attorney Chris Parkinson said], [this is not Plaintiff]. That's not my photo either cause my phone is still in my lap and nobody posted that on social media

25. At the time of receiving this call, upon rejecting it and blocking the number, it was said to opposing counsel before the hearing to the effect that Farrow Law's 16 years history, its has have never experienced intense, repeated, similar and consistent attacks, or the receipt of a photo likely from a family member's phone via Verified Number of him holding his infant child. Yet, opposing counsel was insistent on moving forward with the hearing.

26. Nor do I have any Clients or former Clients that have acted hostile towards me or my staff such that undersigned could attribute this conduct, and repetition of same.

27. And, after substantial research, with respect to motivation, the cyber-attacks against myself, my firm and my family did not, at least on a noticeably level, did not occur until after the Amended Complaint was filed adding FTI Consulting as a Defendant, and the most serious attack occurred on June 17, 2024, after the filing of the Amended Injunction.

28. Over the last three weeks, and continuing, not only has undersigned not received any demonstration of a desire to get to the bottom of what has occurred, it has gotten worse after undesigned spoke with Zurick's counsel, Mr. Oprison.

29. Succinctly, undersigned asserts that the following factually supports the entry of an emergency restraining order under either the inherent power and/or the statutory power under Florida's RICO act:

(1) the timeline of events described above;

(2) the similarities of the pattern of conduct (photo, phishing emails, phishing text, hacking undersigned's pacer account to prevent filing and attempting to hack into Plaintiff's insurance portal with the FDFS;

(3) the allegations within the complaint that specifically related to using highly advanced cyber-attacks;

(4) the timing of the conduct (to wit: before undersigned's hearings or a deadline in one of undersigned's cases);

(5) the insider (yet disclosed) trading of the sale of close to $25MM by insiders on the day of and after a verified motion describing the discovery was filed;

(6) taking judicial notice that none of the 15 or so publicly traded companies seem to have complied with new Security and Exchange Commission Guidelines as to advanced reporting of issue that could effect the company's valuation;

(7) that no mention of the filing of a $75MM Racketeering Case was made by FTI's CEO and Chief Legal Officer Curtis Lu at either the meeting reporting first Quarter earnings were the highest ever;

(8) the historical background of some of the other juggernauts FTI has been involved over the last five to ten years;

(9) the litigation history of the Appointees whom routinely file SLAPP lawsuits as to chill and threaten any of their opponents;

(10) FTI's own public announcements of recent hires, including former FBI agent considered to be the best "hacker" in the world;

(11) the list of thousands of fake LinkedIn accounts which demonstrate a massive global fraud, and thereafter a hearing to fashion an orderly structure that does not lend itself to lawlessness due to the use of a fake expert;

(12) motivations - the discovery that FTI, the Appointees and their co-conspirator Defendants had falsified evidence in two other cases, called a known imposter to testify at a hearing whom claimed to work for FTI but did not, had been using the latest cyber-intelligence psychological attacks on two Judges in Seminole county in websites, caught FTI's CEO, Steven Gunby, CFO, Chief Strategy Officer and Chief Human Resource Officer selling shares after they were on notice that evidence of criminal conduct had been unearthed, that a few of FTI and the Appointees' employees became intertwined with a woman recently arrested in Arizona for supporting the creating of fake profiles and supplying laptops to falsify the location of illegal IT remote workers, and that Plaintiff and undersigned had found more than 3000 "fake" LinkedIn profiles of individuals claiming to work for FTI, including the imposter expert – the same amounts to a serious threat to their multi-billion dollar criminal enterprise.

30. I also attest, that the receiving of the photograph has, and continues to cause undersigned and his wife great emotional suffering.   As stated above, as the medical director of a pediatric transplant program, she gets to interact with her special patients and develops a kinship of health and health, and some of these children begin their journey as an organ recipient in the first few months of life, and she gets to see most of them grow up, with one recently getting to attend her high-school prom.   Yet, in the last six weeks, some of her young patients have died, and even though she is not their parent, she ever-the-same feels loss, and using an intentional means to social engineer a first responder was as impactful as FTI claims their experts to be.

## ARGUMENT: MEMORANDUM OF LAW
### Florida RICO Provides for Restraining Orders

Plaintiff and his undersigned counsel seek a very limited emergency restraining order, under either this Court's inherent powers and/or under the Florida RICO Act § 895.05(6) entitled "Civil Remedies." Plaintiff has asserted a cause of action against Defendants and has requested temporary injunctive relief in the Amended Complaint.

Fla. Stat. 895.05(6) provides for injunctive relief for parties injured by violations of the Florida RICO Act and states in relevant part:

> Upon the execution of proper bond against damages for an injunction improvidently granted and a showing of immediate danger of significant loss or damage, a temporary restraining order and a preliminary injunction may be issued in any such action before a final determination on the merits. (emphasis added).

As recognized by Florida's Third District Court of Appeal: "Unlike its federal counterpart, the Florida RICO statute contains an express provision for private injunctive relief." *Banco Indus.*

*de Venezuela, C.A. v. Mederos Suarez*, 541 So.2d 1324, 1326 (Fla. 3rd DCA 1989).[7]

To be clear, based upon the filing of this verified motion,  Plaintiff need only: (1) show an immediate danger of significant loss or damage; and (2) post an appropriate bond given the circumstances of this case where he has substantially demonstrated millions of dollars in damages over the course of 10 years. *Id.*

In *Suarez*, plaintiff filed a four-count complaint against defendants, alleging common law fraud, conspiracy, debt, and Florida RICO violations. *Suarez,* 541 So.2d at 1325.  Plaintiff alleged a complex scheme on the part of the defendants to take advantage of an import program which illegally leveraging the theft of $2.3 million. *Id.*  Plaintiff filed a motion for a temporary injunction, enjoining the defendants from "disposing of 'any assets whatever their present form, representing, in whole or in part, funds derived from payments' from the racketeering scheme. *Id.* The trial court ruled that it could not issue the temporary injunction because "[Plaintiff] was unable, prior to discovery, to identify the stolen funds to assets held by the defendants." *Id*. at 1326.

The Third District Court of Appeal reversed, holding that plaintiff was entitled, as a matter of law, to a temporary injunction because it filed verified allegations which made a sufficient showing of immediate danger and significant loss, and posted an appropriate bond. *Id*. at 1327. Specifically, in a profound analysis of Section 895.05(6), the Third DCA held:

> As we read the plain language of the balance of <u>section 895.05(6)</u>, the only requirements for a *preliminary* injunction under the Florida RICO Act, <u>upon the filing of a verified complaint, are (1) posting a sufficient bond against damages, and (2) showing an "immediate danger of significant loss or damage." Where a plaintiff under the Florida RICO Act has filed a verified complaint, furnished a sufficient bond, and made the requisite showing, the statutory criteria for a preliminary injunction are satisfied.</u>

---

[7] "The Florida RICO statute … specifically authorizes preliminary injunctions." *Bardfield v. Chisholm Properties Circuit Events, LLC*, 2009 WL 1659641, at *2 (N.D.Fla. June 12, 2009) (*citing* Fla. Stat. § 895.05(6)).

> Our construction is supported not only by the plain language of the statute, but also by the enabling clauses of the Act, which contain clear legislative findings that the national scope of organized crime is highly sophisticated and diverse and that the same patterns of unlawful conduct exist in Florida, making it "necessary to provide *new* criminal and civil remedies and procedures...." RICO Act, ch. 77–334, 1977 Fla. Laws 1399 (emphasis supplied). **It is highly unlikely that the Florida legislature drafted and passed the RICO Act with nothing more in mind than merely codifying the common law regarding preliminary injunctions**. [Emphasis added].

In its amplification of the importance of not only the plain meaning of 895.05(6), but also the enabling clauses of the [Florida RICO Act found in 895.02 and 895.03], the Third DCA in *Suarez* further held:

> We think the point is well taken that: "[it] would have been eminently reasonable for the legislature, in view of the type of wrongdoer the RICO statute is meant to punish, to have relaxed the common law requirements for temporary injunctions so that the plaintiff, at the close of the lawsuit, would be able to seize some of the moneys he was deprived of by fraud or theft. In sum, **the primary mischief the statute addresses is the likelihood that a party charged with RICO violations will get rid of his assets before the RICO plaintiff can obtain a judgment and attachment. And the true reason for the remedy is that there may well exist other parties seeking to sequester the defendant's assets who can accomplish this purpose before a successful adjudication on the merits is ever reached**." [internal citations omitted]. [Emphasis added].

*Id.* at 1367.

Indeed, to use an analogy, Law Enforcement doesn't call ahead to alert RICO Defendants to see if it is a convenient time for them to stop by to stop them from attempting to hack Plaintiff or undersigned's accounts. And in Florida, the legislature found it so important that a civil litigant have similar remedies to obtain an equitable restraining order under these circumstances where, in effect, the Defendants are attempting to intimidate counsel for Plaintiff and his family, and have been doing this for some time, however the conduct in the last two plus weeks demonstrates the

need for an emergency order restraining the types of conduct which obstruct Plaintiff and undersigned from prosecuting this case, and worse.

Florida RICO Act's plain language and legislative intent make sense – especially where, as here, Defendants have gone into full panic mode and have shown they are willing to break the law, continue to break the law, and with a publicly demonstrated attitude that it's what their clients want that matters most, notwithstanding any of the damages caused to undersigned's firm, or emotionally to he and his wife, all of which are immediate and substantial harm and damages that have continue to accrue as the conduct continues to happen.

Plaintiff and his undersigned counsel herein have demonstrated imminent danger of significant loss or damages as RICO Defendants in terms of severe trauma and monetary damages incurred by Plaintiff's law firm. *Suarez,* 541 So.2d at 1325; Fla. Stat. § 895.05(6); *see also Johnson Enters, of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1302 n.18 (11th Cir.1998).

To be clear, FTI, the Carrier Defendants and their co-conspirators are facing serious, and potentially permanent consequences for operating a Criminal Enterprise in which they all work off a conveyor belt in a synergistic and institutionalized manner which derives billions of dollars in revenue each year from all over the Globe.   The profound relationships between FTI, the Carrier Defendants and the law firms, such as DLA Piper, that have appeared thus far to represent them is so incestuous that it is unsurprising that they have created, planned, and implemented a crisis management strategy which is directed to destroy the adverse law practice, and terrorize his family, as well as Plaintiff.

## This Court's Inherent Powers

It is Black Letter Law that this Court has the power to restrain attempts to interfere with court proceedings, hacking into computer systems and transmitting a picture of undersigned

counsel's infant from an unknown number, directly to undersigned, that was taken from someone's phone without their permission and was never put into the public domain. Especially, where, in totality the inference is to cause severe emotional trauma to an individual, FTI and Appointees know well, to be in a career where she serves to care for children who are very sick and where, unless it is a highly rare case of a living donor, a child has to die for another to live.

Targeted email campaigns with links to malware to illegally break into another law firm's databased, or that of the Florida Department of Financial Services, is not expression of speech, and neither is the targeting of a illegally procured photo specifically targeted to an individual which is commonly understood, in that context, to infer a willingness to harm the child, is not protected by the First Amendment or any other law.

While there is no requirement that this Court find a restraining order to be in the public interest under its inherent powers, Plaintiff and undersigned counsel add that FTI, the Carrier Defendants and the Appointees may not realize it on a corporate level,  but, certainly some of the people whom make up those entities should know that perhaps, actually more than perhaps, that undersigned's wife is a first responder as is her surgical Team who have touched their lives of a child they know - or far far far more than perhaps, that of one of their clients likely has a story of hope and inspiration to share from the miracles they create every day.   While this is a motion for a restraining order, and not a suggestion box, perhaps a crisis management investigation to determine the above might, if not through judicial order, but human decency, stop what should have never been started.

**WHEREFORE**, Plaintiff and undersigned counsel respectfully request an emergency restraining order to prohibit any Defendants, or their agents, the Appointees, Insurance Office of America, Inc., Heath Ritenour and John Ritenour, or contractors or affiliates, from sending to

Plaintiff, undersigned counsel, any individual working for Farrow Law, P.A., any immediate family member of undersigned, any text message which contain a picture of a minor child, or to strategically interfere by way of cyber interference through phishing emails, or direct blunt force or Open Source Intelligence gathering generated hacking of any kind against Plaintiff, undersigned counsel, Farrow Law, P.A. or any individual working for undersigned counsel's cell phone, computer, lab top, iPad, website, social media account or other device or account until further order of this Court. Bond: Plaintiff respectfully recommends that bond be set at $1.00.

## **VERIFICATION**

On June 21, 2024, under penalties of perjury under the laws of the United States of America and the State of Florida, I declare that I have read the foregoing and that the facts stated therein are true.

BY: **/s/Jay L. Farrow, Esq.,**

JAY L. FARROW, ESQ.
June 20, 2024


## **CERTIFICATE OF TRUE EMERGENCY**

After reviewing the facts and researching applicable legal principles, I certify that this motion in fact presents a true emergency (as opposed to a matter that may need only expedited treatment) and requires an immediate ruling because the Court would not be able to provide meaningful relief to a critical, non-routine issue after the expiration of seven days. I understand that an unwarranted certification may lead to sanctions.

BY: **/s/Jay L. Farrow, Esq.,**
JAY L. FARROW, ESQ.
Florida Bar No. 625213

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 21, 2024, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF.

Respectfully submitted,

**FARROW LAW, P.A.**
*Attorneys for Plaintiff*
1 Alhambra Plaza, Penthouse
Coral Gables, Florida 33134
Telephone: (954) 252-9818
jay@farrowlawfirm.com
service@farrowlawfirm.com

BY: **<u>/s/Jay L. Farrow, Esq.,</u>**
JAY L. FARROW, ESQ.
Florida Bar No. 625213

21